David PALACIOS, Petitioner,

v.

John W. BURGE, Superintendent, Auburn Correctional Facility, and Eliot L. Spitzer, New York State Attorney General, Respondents.

No. 03–CV–6436 (FB).

United States District Court, E.D. New York.

Jan. 18, 2007.

Lawrence T. Hausman, Legal Aid Society Criminal Appeals Bureau, New York, NY, for the Petitioner.

Richard A. Brown, District Attorney, Queens Country by John M. Catellano, Jill A. Gross–Marks, Assistant District Attorneys, Kew Gardens, NY, for the Respondent.

## MEMORANDUM AND ORDER

BLOCK, Senior District Judge.

Petitioner, David Palacios ("Palacios"), was convicted in New York Supreme Court, Queens County, on one count of murder and one count of assault and sentenced to two consecutive indeterminate terms of imprisonment: twenty-five years to life for the murder conviction and eleven to twenty-two years for the assault conviction. He now seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on two grounds: (1) ineffective assistance of trial counsel for failing to raise a Fourth Amendment violation, and (2) Double Jeopardy. Palacios's claims were presented to and rejected by the Appellate Division, Second Department, *see People v. Palacios,* 295 A.D.2d 452, 743 N.Y.S.2d 302 (2d Dep't 2002), and were fully exhausted when the New York Court of Appeals denied leave to appeal. *See People v. Palacios,* 98 N.Y.2d 731, 749 N.Y.S.2d 482, 779 N.E.2d 193 (2002) (table). For the reasons set forth below, the petition is denied.

## BACKGROUND

On April 27, 1997, a group of Hispanic men attacked Sanin Djukanovic ("Djukanovic") and his brother-in-law Edin Kolenovic ("Kolenovic"), resulting in Djukanovic's death and serious injuries to Kolenovic. Shortly after the attack, police officers detained all the men in a nightclub located near the scene of the attack and conducted a showup, during which Kolenovic and another individual, who claimed to have witnessed the attack, identified Palacios as a participant;

thereafter, Palacios was arrested and, while in custody, made inculpatory statements.

Counsel for Palacios filed motions challenging the reliability of Kolenovic's pretrial identification and the voluntariness of Palacios's statements. The trial court held a combined hearing pursuant to *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965) ("*Wade/Huntley* hearing"), to determine whether the pretrial identifications and statements were constitutionally admissible; however, since Palacios did not challenge the constitutionality of his detention at the nightclub, no hearing was held in regard to whether the identifications and/or statements should have been suppressed as the fruits of a Fourth Amendment violation.

### A. *Wade/Huntley* Hearing

At the *Wade/Huntley* hearing, the following was established: On April 27, 1997, in response to a report of possible gang activity, Officers Richard Crespo ("Officer Crespo"), Danny Corey ("Officer Corey") and James O'Boyle ("Officer O'Boyle"), all dressed in plain clothes, were conducting surveillance in an unmarked vehicle outside of a nightclub located at 30–30 Northern Boulevard in Queens. Officer Crespo testified that at approximately 9:10 p.m., he noticed a group of Hispanic men shove their way to the front of the line of people waiting to get into the club; within a few seconds, Kolenovic drove up to the club and informed the officers that he and his brother-in-law had just been attacked a few blocks away by a group of Hispanic men who had run towards the club. Officer O'Boyle testified that he did not "believe" that he asked Kolenovic for a better

description. Tr. at 70.[1]

Djukanovic was rushed to the hospital, but Kolenovic remained in an ambulance outside the club, which was parked approximately 25 feet from the club's front entrance, and urged the officers to let him attempt to identify the culprits; thereafter, uniformed officers, including Detective Robert Ledee ("Detective Ledee"), arrived at the club and sealed its exits. Detective Ledee testified that he asked the club's manager to permit those in line to enter the club. The manager agreed, and stopped the music; he also announced that the officers would be conducting a showup of the males who were in the club because they had reason to believe that the perpetrators of the attack were among them. *See* Tr. at 84. According to Detective Ledee, the men "all agreed to come outside for the showup." Tr. at 85. Officer Crespo testified that "over 100" Hispanic males participated in the showup, Tr. at 22; the state has since conceded that the number of participants was over 170. *See* Palacios's Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus ("Palacios's Mem.") at 20.

Prior to conducting the showup, the officers observed William Mero ("Mero"), who was in line waiting to enter the club, step out of line and leave.[2] One of the officers caught up with him and "walked" Mero over to the ambulance. Kolenovic, who was still in the ambulance, immediately identified him as "one of the guys[,]" Tr. at 103, and Mero was arrested. Although Mero denied any involvement in the attack, he informed the officers that he had seen the fight and could identify those involved; Mero was then placed in the

unmarked police car with a view of the impending showup.

Detective Ledee testified that at about 10:00 p.m., the officers "lined [the men] up" in the club and "one by one ... marched them" to the front door. Tr. at 84. From there, the men walked down the stairs and each was individually escorted about 50 feet from the club, where the showup was conducted.[3]

During the showup, Kolenovic and Mero separately identified Palacios as involved in the attack. Palacios was arrested and transported to the station house at approximately 11:05 p.m. At 1:30 p.m., the following day, Detective Lauri Senzel ("Detective Senzel") informed Palacios of his *Miranda* rights, after which he agreed to speak with her. Detective Senzel testified that Palacios gave the following oral statement:

> He told me that he had gone to the club. He had bought a ticket ahead of time. There was a special party or group playing that evening. He went to the club, it wasn't open yet. He was hanging out with a few people out in front of the club. A larger group came, joined the line. They sort of branched off from the rest of the people that were standing on line waiting to go in and they went roaming around in the neighborhood. They found two guys that had come out of a club at a video bar two or three blocks away and decided to jump [sic] being that they were in a big group. He said he wind [sic] up stabbing one of the guys that they jumped.

---

1. Tr. refers to the transcript of the *Wade/Huntley* hearing.

2. It is unclear whether the officers encountered Mero before or after they informed the men in the club of the impending showup.

3. The record does not reveal the amount of time that elapsed between the time that the officers sealed the exits and the time that the officers conducted the showup.

Tr. at 123–24. At Detective Senzel's request, Palacios repeated his version of the events that took place that night, elaborating on what transpired before and after the altercation; Detective Senzel then reduced Palacios's second statement to writing, which Palacios signed.

At the conclusion of the hearing, the trial court "f[ou]nd[ ] that all of the witnesses [had] testified credibly," Tr. at 160, and denied Palacios's motions to suppress his statements to law enforcement and Kolenovic's pre-trial identification. Regarding the pre-trial identification, the trial court concluded that "the large number of persons involved in [the showup] procedure ... completely eliminates suggestiveness and standing by itself removes any possible suggestiveness or taint." *Id.* at 166–67.

## B. Trial

At trial, Kolenovic testified as to what transpired on April 27, 1997, but was unable to make an in-court identification of Palacios; instead, his pretrial identification was admitted into evidence. Additionally, Detective Senzel recounted Palacios's oral statement, and his written statement was introduced into evidence. No other evidence was presented connecting Palacios to the attack on Kolenovic and Djukanovic. The jury found Palacios guilty of depraved-indifference murder of Djukanovic and depraved-indifference assault of Kolenovic.

## C. Direct Appeal

On direct appeal, Palacios raised both claims presented in his *habeas* petition; he did not challenge the trial court's conclusion that the showup procedure was not unduly suggestive. With respect to the ineffective-assistance claim, the Appellate Division ruled:

Contrary to the defendant's contention, he received the effective assistance of counsel. In resolving claims of ineffective assistance of counsel, the critical issue is whether, viewed in totality, the defense counsel provided meaningful representation.... The defendant's disagreement with the strategies and tactics employed by the defense counsel does not amount to a deprivation of effective assistance of counsel.

*Palacios,* 743 N.Y.S.2d at 302 (internal citations omitted).

With respect to Palacios's Double Jeopardy claim, which was based on the trial court's imposition of consecutive sentences, the Appellate Division ruled that consecutive sentences were proper "since the crimes committed were based on separate and distinct acts." *Id.*

## STANDARD OF REVIEW

 Only federal issues may be raised on *habeas* review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a federal claim has been "adjudicated on the merits" by a state court, the state court's judgment is entitled to substantial deference. *See* 28 U.S.C. § 2254(d). "[A] state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001) (citations and quotations omitted).

For claims "adjudicated on the merits," *habeas* relief may not be granted unless the state court "decision" (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court recently reiterated, the phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin,* —— U.S. ——, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

■■■ A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different conclusion. *Williams v. Taylor,* 529 U.S. at 405–06, 120 S.Ct. 1495. A state court decision involves an "unreasonable application" of clearly established federal law if it unreasonably applies Supreme Court precedent to the particular facts of a case. *See id.* at 409, 120 S.Ct. 1495. This inquiry requires a court to "ask whether the state court's application of clearly established federal law was objectively unreasonable," not whether the application was erroneous or incorrect. *Id.* In that respect, the standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Wade v. Mantello,* 333 F.3d 51, 57 (2d Cir.2003) (quoting *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000)). However, the "increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Eze v. Senkowski,* 321 F.3d 110,

125 (2d Cir.2003) (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).

The Supreme Court has cautioned that, in applying AEDPA's "unreasonable application" prong, courts must be mindful of the nature of the pertinent precedent:

If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *see also Overton v. Newton,* 295 F.3d 270, 278 (2d Cir.2002) ("[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context.").

In *Cruz v. Miller,* 255 F.3d 77 (2d Cir. 2001), the Second Circuit held that the state court "decision" that is subject to review under AEDPA is the state court's result, not its reasoning. *See id.* at 86 ("Although sound reasoning will enhance the likelihood that a state court's ruling will be determined to be a reasonable application of Supreme Court law, deficient reasoning will not preclude AEDPA deference ...." (citations and internal quotation marks omitted)); *see also Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (same); *Hennon v. Cooper,* 109 F.3d 330, 334–35 (7th Cir.1997) (same). A year later, the Supreme Court commented that AEDPA "does not require citation of our

cases—indeed, it does not even require awareness of our cases, so long as *neither the reasoning nor the result* of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (emphasis added); however, no court has read *Early* as suggesting that incorrect reasoning, standing alone, warrants *habeas* relief. *See, e.g., Sims v. Rowland,* 414 F.3d 1148, 1152 n. 2 (9th Cir.2005) ("To our knowledge, the Supreme Court has never granted habeas relief solely on the basis of the 'reasoning' used by the state court."). Thus, the Court concludes that *Cruz* remains good law.

## DISCUSSION

### A. Ineffective Assistance

■ Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must show that counsel's representation "fell below an objective standard of reasonableness" based on "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. While *Strickland* differentiates between ineffective assistance and "the wide latitude counsel must have in making tactical decisions," *id.* at 689, 104 S.Ct. 2052, the Court cannot agree with the state court that trial counsel's failure to move to suppress Kolenovic's identification was simply a matter of sound tactics: A pretrial motion to suppress, if unsuccessful, would have had a negligible impact on counsel's

trial strategy; if successful, it would have vitiated a key component of the case against Palacios.

Nevertheless, under *Cruz,* the state court's unpersuasive reasoning is not dispositive; the Court must instead analyze the state court's ultimate conclusion that trial counsel's failure to pursue the Fourth Amendment issue did not rise to the level of ineffective assistance.

■■ "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison,* 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).[4] As discussed below, Palacios's claim fails the first prong; thus, the Court need not reach the second.

The Fourth Amendment prohibits "unreasonable searches and seizures." At oral argument, the respondent conceded that Palacios was seized: officers sealed off the exits, the music was turned off, and the club manager informed club patrons over a loud speaker that the officers would be conducting a showup. *Cf. United States v. Drayton,* 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (finding of no seizure supported by fact that there was "no blocking of exits, no threat, no command, not even an authoritative tone of voice"). That the men in

4. While *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), bars the Court from reviewing a Fourth Amendment claim on *habeas* review, it does not bar *habeas* review of an ineffective-assistance claim based on counsel's failure to litigate a Fourth Amendment claim. *See Kimmelman,* 477 U.S. at 382–83, 106 S.Ct. 2574 ("We reject

petitioners' argument that *Stone's* restriction on federal habeas review of Fourth Amendment claims should be extended to Sixth Amendment ineffective-assistance-of-counsel claims which are founded primarily on incompetent representation with respect to a Fourth Amendment issue.").

the club complied with officers' instructions demonstrates not consent, but "a mere submission to a claim of lawful authority." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *see also Kaupp v. Texas,* 538 U.S. 626, 629, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) ("A seizure of the person within the meaning of the Fourth ... Amendment[ ] occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." (citations and internal quotation marks omitted)).

Thus, the inquiry becomes whether the seizure was reasonable. Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it is not unreasonable for a police officer to stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity is afoot. *See id.* at 21–22, 88 S.Ct. 1868. The Second Circuit recently joined a long list of courts that have held that "the police may transport a suspect for identification purposes as part of a *Terry* stop." *United States v. McCargo,* 464 F.3d 192, 199 (2d Cir.2006) (citing federal cases from First, Eighth and D.C. Circuits, and state cases from New York, Michigan and California). There must, however, be some connection between the individual detained and the wrongdoing: "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond,* 531 U.S. 32, 35, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).

■ The exceptions to the requirement of individualized suspicion are "very limited." *Edmond,* 531 U.S. at 37, 121 S.Ct. 447. While they cover a variety of disparate circumstances—ranging from random drug testing to administrative inspections to border-control and sobriety checkpoints—they all have one thing in common, namely, a purpose other than crime detection; the Supreme Court has never "approv[ed] of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Id.* at 38, 121 S.Ct. 447; *see also Illinois v. Lidster,* 540 U.S. 419, 423, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (approving suspicionless stop whose "primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others"). The showup that resulted in Palacios's arrest was plainly for the purpose of discovering the perpetrators of the assault and, therefore, cannot be excepted from the requirement of individualized suspicion.

Palacios argues that the showup outside the club was not supported by individualized reasonable suspicion. First he argues that "[p]roximity, combined with a description of race and gender," will rarely, if ever, satisfy constitutional standards. Palacios's Mem. at 26. The Court agrees with this premise, *see Brown v. City of Oneonta,* 221 F.3d 329, 334 (2d Cir.2000) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure."), but concludes that it does not apply. The officers did not detain all Hispanic men who happened to be *near* the crime scene; rather, based on Kolenovic's report that he had just been attacked and that his attackers were a group of Hispanic males who had run towards the club, and on Officer Crespo's observation that a group of Hispanic males had just shoved their way into the club, the officers reasonably surmised

that the attackers were in the club and, therefore, limited the detention to Hispanic men within that *confined* location.

Thus, the issue, properly framed, is whether the officers, reasonably believing that the perpetrators of a serious crime were in a particular building, had individualized reasonable suspicion as to every person in that building who fit the crime victim's description of the perpetrators' race and sex. Neither the parties' nor the Court's own research has uncovered a case in which the Supreme Court has addressed this precise issue. Indeed, the only content the Supreme Court has given the "individualized suspicion" requirement is that it prohibits law enforcement from uncovering evidence of wrongdoing through searches or seizures unsupported by *any* suspicion. *See, e.g., Edmond,* 531 U.S. at 41–42, 121 S.Ct. 447 (holding that "general interest in crime control" does not justify "a regime of suspicionless stops"). This general rule against suspicionless stops is inapplicable here; the officers had reasonable suspicion to believe that *someone* in the club had committed the assault.

In the absence of any specific guidance from the Supreme Court, this Court is left to determine whether approving the show-up would amount to an unreasonable application of the broad requirement of individualized suspicion. *Cf. Overton,* 295 F.3d at 278 (holding the Supreme Court precedents on racially discriminatory use of peremptory challenges "must be read as not only prohibiting certain specific actions, but also as creating a broad standard or principle that the courts must, in reason, follow"). In light of the generality with which the requirement has been enunciated, the Court must, under *Yarborough,*

give substantial leeway to its application in a particular case.

Under these deferential standards, the Court holds that it would not be unreasonable to conclude that the "individualized suspicion" requirement had been satisfied in this case. As a well-respected commentator has observed, "[e]ven if the circumstances are such that no one person can be singled out as the probable offender, the police must sometimes be allowed to take some action intermediate to that of arrest and nonseizure scrutiny" and "must have some authority to freeze the situation." Wayne R. LaFave, Search And Seizure: A Treatise On The Fourth Amendment, 4 Search & Seizure § 9.5 (4th ed.). Although over 170 people matched the description of the suspects, the probability that each individual stopped had been involved in the attack was much higher than 1–in–170 because Kolenovic had reported that a group—not just one individual—had participated in the attack and had run towards the club.

There are undoubtedly circumstances in which the sheer number of individuals, even in a confined location, would render the probability that any one of them had engaged in a crime so slight as to defeat individualized suspicion. For example, a showup involving every spectator of a Knicks game at Madison Square Garden would undoubtedly run afoul of the Fourth Amendment, even if police knew with absolute certainty that one of them had fled there after committing a crime. But the showup at issue, involving as it does a non-negligible probability that a given Hispanic male inside the club was involved in the assault, does not approach this extreme.[5]

---

**5.** At the other extreme, knowledge that a crime suspect had fled into an otherwise unoccupied building would certainly provide reasonable suspicion to detain the individual; however, presenting that single individual to the crime victim might well violate due process, which bars the admission of pre-trial identifications based on unduly suggestive

In sum, the limited standard of review under AEDPA makes it inappropriate for a *habeas* court to hold a state court to a precise point at which the number of people in a confined location negates reasonable suspicion as to each person; accordingly, the Court concludes only that the showup at issue is not so far beyond that point as to constitute an unreasonable application of the "individualized suspicion" requirement.

Nevertheless, reasonable jurists could debate the Court's conclusion. Although there are no cases supporting Palacios's contention that "[b]ecause the police had to know that a vast majority of those individuals [in the club] were not involved in the crime that they were investigating, they could not, as a matter of logic, possess individualized suspicion as to any one of the seized individuals," Palacios's Mem. at 26, it would not be unreasonable to accept it as a proper interpretation of the "individualized suspicion" requirement. Given this room for reasonable debate, as well as the dearth of case law addressing this ineffective-assistance/Fourth Amendment scenario, the Court will issue a certificate of appealability ("COA") on this claim. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483–84, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that ... includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the peti-

tion should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." (citation and internal quotation marks omitted)).

## B. Double Jeopardy

 The Double Jeopardy Clause protects against, *inter alia,* multiple punishments for the same offense. *See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). When consecutive sentences are imposed in a single trial, the Double Jeopardy Clause is violated only if the sentencing court meted out a "greater punishment than the legislature intended." *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

 New York Penal Law § 70.25(2) provides in relevant part:

When more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences ... must run concurrently.

However, under New York law, "[e]ven if the material elements overlap, consecutive sentences are permissible where the People demonstrate that the offenses are based on separate and distinct acts." *People v. Parks,* 95 N.Y.2d 811, 815 n. 2, 712 N.Y.S.2d 429, 734 N.E.2d 741 (2000) (citing *People v. Laureano,* 87 N.Y.2d 640, 643, 642 N.Y.S.2d 150, 664 N.E.2d 1212 (1996)).

---

procedures. *See Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification which violates a defendant's right to due process."); *Wray v. Johnson,* 202 F.3d 515, 524 (2d Cir.2000) (showup at which crime victim was shown only one individual was unduly suggestive).

At the conclusion of the *Wade/Huntley* hearing, the trial court rejected Palacios's claim that the showup was unduly suggestive based on the large number of people who participated in the procedure. Palacios understandably did not pursue this claim on direct appeal, and does not raise it in his *habeas* petition.

Although part of one extended transaction, the offenses here were based on separate and distinct acts: one involved the stabbing of Kolenovic and the other involved the stabbing of Djukanovic. *See People v. Brathwaite*, 63 N.Y.2d 839, 843, 482 N.Y.S.2d 253, 472 N.E.2d 29 (1984) (upholding consecutive sentences because "although the two deaths may be said to have occurred in the course of a single extended transaction ... it was separate 'acts' which caused the deaths of the owner and the clerk (i.e., there is no contention that it was the firing of the same shot that killed both the owner and the clerk), and neither was a material element of the other."); *see also Lyon v. Senkowski*, 109 F.Supp.2d 125, 141 (W.D.N.Y.2000) (same). Thus, the state court's conclusion that the consecutive sentences did not run afoul of the Double Jeopardy clause was not contrary to or an unreasonable application of clearly established Supreme Court law.

## CONCLUSION

The petition is denied. A COA limited to Palacios's ineffective-assistance/Fourth Amendment claim will issue.

**SO ORDERED.**