07-0470-pr
Palacios v. Burge

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2008

(Argued: March 11, 2009          Decided: December 21, 2009)

Docket No. 07-0470-pr

------------------------------------------------------x

DAVID PALACIOS,

Petitioner-Appellant,

-- v. --

JOHN W. BURGE, Superintendent, Auburn Correctional
Facility, and ANDREW CUOMO, New York State Attorney
General,[*]

Respondents-Appellees.[**]

------------------------------------------------------x

B e f o r e :  WALKER and SACK, Circuit Judges, and KOELTL,
               District Judge.[***]

Petitioner-Appellant David Palacios appeals from the

judgment of the United States District Court for the Eastern

---

[*]     Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
current Attorney General Andrew Cuomo is automatically
substituted for former Attorney General Eliot L. Spitzer as a
respondent.

[**]    We direct the Clerk of the Court to amend the official
caption as noted.

[***]   The Honorable John G. Koeltl, of the United States District
Court for the Southern District of New York, sitting by
designation.

1

District of New York (Frederic Block, Judge) denying his petition for habeas corpus pursuant to 28 U.S.C. § 2254, which alleges that his counsel rendered him ineffective assistance in violation of the Sixth Amendment by failing to move to suppress evidence of Palacios's show-up identification and confession under the Fourth Amendment. The show-up was limited in scope and duration, and included individuals reasonably suspected of perpetrating a recent, soon-to-be fatal stabbing. There was a strong showing that the show-up was justified by exigent circumstances and, based on the totality of the circumstances, was reasonable, and that the show-up did not unconstitutionally taint Palacios's subsequent confession. Therefore, the state courts did not unreasonably apply clearly established Supreme Court law in denying his ineffective assistance claim. We therefore affirm the district court's denial of Palacios's habeas petition.

AFFIRMED.

LAWRENCE T. HAUSMAN (Steven Banks, on the brief), Legal Aid Society, Criminal Appeals Bureau, New York, NY, for Petitioner-Appellant.

JILL A. GROSS-MARKS (John M. Castellano, on the brief), Assistant District Attorneys, for Richard A. Brown, District Attorney, Queens County, Kew Gardens, NY, for Respondents-Appellees.

JOHN M. WALKER, JR., Circuit Judge:

Petitioner-Appellant David Palacios appeals from the

2

judgment of the United States District Court for the Eastern District of New York (Frederic Block, Judge) denying his petition for habeas corpus pursuant to 28 U.S.C. § 2254.  Palacios claims that he is entitled to a writ of habeas corpus because the state courts unreasonably applied clearly established Supreme Court law in rejecting his claim that counsel rendered ineffective assistance by failing to move to suppress evidence of his show-up identification and confession under the Fourth Amendment.  The police conducted a show-up near the crime scene, limited in scope and duration, that included individuals who were reasonably suspected of perpetrating a recent, soon-to-be fatal stabbing.  We find that the state courts did not unreasonably reject the petitioner's claim of ineffective assistance of counsel.  It was not ineffective assistance to fail to raise a Fourth Amendment claim challenging the show-up, which involved exigent circumstances and, based on the totality of the circumstances, was reasonable.  Similarly, it was not ineffective assistance to fail to challenge the subsequent confession as the fruit of the show-up where there was an insufficient showing that the show-up was unconstitutional.  Accordingly, we conclude that the state courts did not unreasonably apply Strickland v. Washington, 466 U.S. 668, 688 (1984), when they rejected Palacios's claim of ineffective assistance.  Thus, we affirm the district court's denial of Palacios's petition for a writ of habeas corpus.

3

**BACKGROUND**

David Palacios was convicted following a jury trial in New York Supreme Court, Queens County, of single counts of assault and murder, and sentenced respectively to consecutive, indeterminate sentences of eleven to twenty-two years and twenty-five years to life.

**I.  Underlying Events**

The trial evidence showed that on the evening of April 27, 1997, undercover New York City police officers Richard Crespo, James O'Boyle, and Daniel Corey conducted surveillance at the 30-30 Club in Queens, New York, which was holding a "Mexican party." (Trial Tr. 101 Feb. 10-11, 1998.)  The police had information that "there might be problems there" between "rival Mexican gangs."  (Trial Tr. 14, 101.)

The club opened at 9:00 p.m.  After ten to fifteen minutes, Officer Crespo saw several men whom he thought to be Hispanic "run in front of . . . people . . . waiting" in line outside of the club.  (Trial Tr. 14-15.)  Moments later, a BMW pulled up across the street from the club, and a man, Edin Kolenovic, emerged from the car shouting and waving his arms frantically. When the officers approached Kolenovic, they saw that his shirt was bloody, and that his passenger and brother-in-law, Sanin Djukanovic, had been beaten and stabbed, and was bleeding profusely.  Djukanovic was unable to speak and died later that

night. Kolenovic told the officers that a group of Hispanic men tried to steal the BMW, stabbed him and Djukanovic, and ran towards the 30-30 Club. The police placed Kolenovic in an ambulance stationed in front of the club to be treated for his stab wounds.

In "secur[ing] the area" around the club, (Trial Tr. 18,) the officers arranged with the club's security personnel to let into the club the forty or fifty individuals in line outside. When one person, William Mero, stepped out of the line and tried to leave, the police stopped him and walked him in front of the parked ambulance to "conduct [] a show-up." (Trial Tr. 103.) Kolenovic identified Mero as "one of the guys," (Trial Tr. 110,) and Officer Corey handcuffed Mero and put him in an unmarked patrol car with a view of the club. Mero denied any involvement in the stabbing, but told the police that he had seen the fight and could identify the individuals involved.

Inside the club, at the officers' request, the club owner stopped the music and announced that the police planned to escort all the male patrons outside for a show-up to identify anyone connected to the stabbing that had occurred. The officers sealed the exits, separated out the women, and lined up at the front of the club the approximately 170 men, all of whom looked to them to be Hispanic and ranged in age from about eighteen to twenty-five years. The police then had the men walk, one by one, out the

5

front door and in front of Kolenovic and Mero, who were in the ambulance and the unmarked car, respectively. The show-up process began at approximately 10:00 p.m., and ended less than forty minutes later, after which the patrons outside were allowed back into the club. During the show-up, Kolenovic and Mero separately identified the same six men, including Palacios, as being involved in the stabbings. The officers then took Palacios to the precinct house.

The following day, after Detective Laurie Senzel read Palacios his Miranda rights in both English and Spanish, Palacios orally confessed to stabbing Djukanovic. Detective Senzel manually transcribed this confession, which Palacios signed.

**II. Trial Court Proceedings**

On June 17, 1997, Palacios's then-counsel Paul Testaverde filed a motion challenging the constitutionality of both the identification procedure used by the police outside of the 30-30 Club, and the confession, which Palacios claimed that he had given only under physical duress. On June 30, 1997, counsel Robert R. Race, who replaced Testaverde, filed a separate motion that challenged the reliability of Kolenovic's pre-trial identification and the voluntariness of Palacios's statements, but did not challenge the legality of the police seizure of Palacios.

On September 22, 1997, after holding a combined pre-trial

hearing pursuant to United States v. Wade, 388 U.S. 218 (1967), and People v. Huntley, 204 N.E.2d 179 (N.Y. 1965), the trial judge determined that "all of the witnesses testified credibly," (Trial Tr. 160,) found the show-up evidence and confession to be constitutionally permissible, and declined to suppress either item of evidence at trial. In particular, the trial judge "note[d] that the identification of the defendant through this short [show-up] procedure was both tempora[l]ly and spatially close to the events . . . in question." (Trial Tr. 166.) As for the confession, the trial judge determined that Palacios knowingly, voluntarily, and intelligently waived his rights. The trial judge then denied Palacios's subsequent pro se motion to suppress the confession.

At Palacios's jury trial, Kolenovic was unable to identify Palacios as a participant in the crime. Palacios testified that he had not committed the crimes charged and that he had confessed under physical duress.

The jury found Palacios guilty of both assault and murder, and the trial judge sentenced Palacios to eleven to twenty-two years for the former and twenty-five years to life for the latter, to be served consecutively.

**III. Subsequent Proceedings**

In January 2002, Palacios, on appeal to the Appellate Division, Second Department, argued that he had been deprived of

7

effective assistance of counsel under Strickland, 466 U.S. at 688, because his counsel unreasonably failed to challenge the lawfulness of his show-up and detention, and failed to move to suppress his confession as the fruit of the unlawful detention under the Fourth Amendment. Palacios alleged that a Fourth Amendment challenge to the show-up would have been successful, because the show-up was not based upon any "individualized suspicion" of a particular individual at the 30-30 Club. See Palacios, 470 F. Supp. 2d at 219. The Appellate Division affirmed Palacios's conviction, concluding that he had received "meaningful representation" at trial. People v. Palacios, 743 N.Y.S.2d 302, 302 (App. Div. 2002). Palacios's application for leave to appeal to the New York Court of Appeals was denied. People v. Palacios, 779 N.E.2d 193 (N.Y. 2002) (table decision).

Palacios then filed the instant petition for federal habeas relief, again raising the claim that trial counsel had rendered ineffective assistance. In January 2007, the district court denied the petition on the basis that Palacios had failed to show that the trial court unreasonably applied Supreme Court precedent in determining that the claim lacked merit. Palacios v. Burge, 470 F. Supp. 2d 215, 221 (E.D.N.Y. 2007). Although noting that a show-up could run afoul of the United States Supreme Court's "individualized suspicion" requirement, the district court determined that, "[i]n light of the generality with which the

8

requirement has been enunciated" by the Supreme Court, it would not be "unreasonable" to conclude that the individualized suspicion requirement was "satisfied in this case." Id. at 223. The district court concluded that under the "limited standard of [habeas] review," Palacios's petition had to be denied. Id. at 224. The district court, however, issued a certificate of appealability on Palacios's ineffective assistance claim on the basis that there was "room for reasonable debate . . . addressing this ineffective-assistance/Fourth Amendment scenario." Id.

This appeal followed.

**DISCUSSION**

We review de novo the district court's decision to deny Palacios habeas relief. See Jenkins v. Artuz, 294 F.3d 284, 290 (2d Cir. 2002). Under the deferential standard of review established by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), where the petitioner's claim "was adjudicated on the merits in State court proceedings," as here, we may only grant habeas relief if the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States," or "was based upon an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

Although Stone v. Powell, 428 U.S. 465, 494 (1976), bars us

9

from considering Fourth Amendment challenges raised in a petitioner's petition for habeas relief, this appeal does not squarely present a Fourth Amendment challenge. Instead, Palacios's habeas petition brings a "Sixth Amendment ineffective assistance of counsel claim[] which [is] founded primarily on incompetent representation with respect to a Fourth Amendment issue." Kimmelman v. Morrison, 477 U.S. 365, 380 (1986). Specifically, Palacios argues that the state court unreasonably applied the Supreme Court's decision in Strickland, 466 U.S. at 688, by rejecting his claim that his counsel rendered constitutionally deficient performance by failing to raise a Fourth Amendment challenge seeking to suppress the identification evidence and the "fruits of [Palacios's] illegal detention." Pet'r Br. at 31. We may grant habeas claim for such a hybrid Sixth and Fourth Amendment claim, Kimmelman, 477 U.S. at 380-83; however, its "elements of proof"

> differ[] significantly from [those] applicable to a straightforward Fourth Amendment claim. Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim like [Palacios]'s, a good Fourth Amendment claim alone will not earn a prisoner habeas relief. Only those habeas petitions who can prove under Strickland that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence,

id. at 382.

"[I]n light of Strickland . . . , a Sixth Amendment ineffective assistance of counsel claim necessarily invokes

10

federal law that has been 'clearly established' by the Supreme Court within the meaning of AEDPA." Mosby v. Senkowski, 470 F.3d 515, 518-19 (2d Cir. 2006) (internal quotation marks omitted); see also Williams v. Taylor, 529 U.S. 362, 390-91 (2000) (recognizing the test set forth in Strickland as "clearly established" law for AEDPA purposes).

Strickland requires that a "criminal defendant asserting that counsel is constitutionally deficient" meet both a "performance" test, showing that counsel's representation "'fell below an objective standard of reasonableness,'" and a "prejudice" test, demonstrating that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (quoting Strickland, 466 U.S. at 688, 694). Under Strickland, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. Furthermore, on habeas appeal it is not enough for Palacios to show a constitutional violation. He must also show that the state court's "application of Strickland was not merely incorrect, but objectively unreasonable." Hemstreet v. Greiner, 491 F.3d 84, 89 (2d Cir. 2007) (internal quotation marks omitted). Specifically, Palacios must establish unreasonableness in light of Supreme Court precedent regarding the state courts'

11

Fourth Amendment determination, which underlies the ineffective assistance claim.

For the reasons that follow, we find that Palacios failed to satisfy the "performance" prong of the Strickland test, see 470 F. Supp. 2d at 221-23, and thus, that Palacios failed to meet Strickland's "rigorous" standard, Bell, 500 F.3d at 155 (internal quotation marks omitted). There is therefore no cause for us to reach the "prejudice" prong.

Because Palacios has not shown that his trial counsel was ineffective for failing to raise a Fourth Amendment challenge to his show-up, he has similarly failed to show that his counsel was ineffective for failing to challenge his subsequent jailhouse confession as the fruit of the poisonous tree. See, e.g., United States v. Guarno, 819 F.2d 28, 32 (2d Cir. 1987) (finding that "derivative evidence" need not be suppressed where the predicate evidence was "properly obtained").

**I.    Strickland's "Performance" Prong:  Palacios's Fourth Amendment Unreasonable Seizure Claim**

**A.    Exigent Circumstances in the Absence of Individualized Suspicion**

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing," such as in cases in

12

which the "primary purpose of the [seizure] is ultimately indistinguishable from the general interest in crime control." City of Indianapolis v. Edmond, 531 U.S. 32, 37, 48 (2000). The Supreme Court, however, has made clear that

> [t]he touchstone of the Fourth Amendment is reasonableness, not individual suspicion. Thus, while th[e] Court's jurisprudence has often recognized that "to accommodate public and private interests, some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," . . . the "Fourth Amendment imposes no irreducible requirement of such suspicion."

Samson v. California, 547 U.S. 843, 855 n.4 (2006) (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 560-61 (1976)) (emphasis added); accord Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989) (reaffirming the "longstanding principle" that no "measure of individualized suspicion . . . is an indispensable component of reasonableness in every circumstance"); Skinner v. Ry Labor Executives' Ass'n, 489 U.S. 602, 624 (1989) ("[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable.").

Accordingly, the Supreme Court has recognized "limited circumstances in which the usual rule [requiring individualized suspicion] does not apply." Edmond, 531 U.S. at 37. Individualized suspicion is not needed, for example, in cases involving "an exigency that justifies immediate action on the police's part." Georgia v. Randolph, 547 U.S. 103, 117 n.6

13

(2006); see also id. (collecting and summarizing exigent circumstances that may justify warrantless searches); Edmond, 531 U.S. at 44 (recognizing circumstances involving "exigencies" that permit seizures without individualized suspicion); United States v. Harper, 617 F.2d 35 (4th Cir. 1980).  Specifically, the Supreme Court has indicated that such an exigency exists when the police utilize an "appropriately tailored" seizure "set up . . . to catch a dangerous criminal who is likely to flee by way of a particular route."  Edmond, 531 U.S. at 44.  The show-up in this case involves that exact exigency:  The police knew that the perpetrators were within the finite group of men, whom the officers understood to be Hispanic, inside or lined up outside of the 30-30 Club near the stabbing, and the show-up was contemporaneous to the stabbings and aimed to identify and arrest dangerous criminals who were likely to flee the club and surrounding area were it not for the police seizure. Moreover, there was a high risk that the two witnesses who could identify the perpetrators would not be available at a later time:  the first, one of the stabbed victims, had severe wounds, and the second was a suspect who had tried to leave the scene.  Thus, the challenged seizure does not violate the Fourth Amendment simply because it was made without individualized suspicion.

A different result is not mandated by Ybarra v. Illinois, 444 U.S. 85, 91-92 (1979), which found unreasonable body frisks

14

of a tavern's patrons based on an informant's tip that one of the tavern's bartenders possessed heroin. The Ybarra Court found that the "rash and unreasonable interferences with privacy" at issue were based solely on "a person's mere propinquity to others independently suspected of criminal activity." Id. at 91, 95-96 (internal quotation marks omitted). And, most importantly, the seizure in Ybarra was not justified by any exigent or emergency circumstances. Here, the police knew to a virtual certainty that the perpetrators whom they hoped to identify were among the patrons and likely to escape, and briefly detaining these patrons and instructing them to walk outside, unlike the body frisks in Ybarra, was minimally intrusive. See Martinez-Fuerte, 428 U.S. at 561 (explaining that body searches are "ordinarily afforded the most stringent Fourth Amendment protection"). Therefore, there was a strong showing in this case that the show-up was justified by emergency and exigent circumstances that did not require a showing of individualized suspicion, and "no particularized reason need exist to justify it," id. at 563. Our decision in this case in no way affects the need for individualized suspicion in cases primarily "relat[ing] to ordinary crime control," Edmond, 531 U.S. at 44, and not involving exigencies similar to those presented here. Finding exigent circumstances, however, does not alone answer the question of whether the show-up comports with the Fourth

Amendment.  We must still examine whether it was reasonable, which remains the "touchstone of the Fourth Amendment," Samson, 547 U.S. at 855 n.4.  We now turn to that question.

### B.    Totality of the Circumstances

"[T]o determine whether a search is reasonable within the meaning of the Fourth Amendment," courts "examine the totality of the circumstances."  Samson, 547 U.S. at 848 (internal quotation marks and alteration omitted).  In considering the "totality of the circumstances--the whole picture," United States v. Cortez, 449 U.S. 411, 417 (1981), we take into account "the facts known to the officers," Alabama v. White, 496 U.S. 325, 330-31 (1990), and "balance the privacy-related and law enforcement-related concerns," Illinois v. McArthur, 531 U.S. 326, 331 (2001).

Here, the police knew that two serious stabbings had occurred (one soon-to-be fatal), and they were armed with reliable information that the perpetrators were among the group of individuals inside or lined up outside of the 30-30 Club.  The police could have reasonably believed that the delay necessary to procure a warrant would thwart the possibility of ever finding the perpetrators, by increasing the likelihood that one or more of them would be able to get away.  See United States v. Gordils, 982 F.2d 64, 69 (2d Cir. 1992) (holding that "a likelihood that the suspect will escape" supports a finding of exigency).  The police had two eyewitnesses who were able to identify the

16

perpetrators, but who may have been unable or unwilling to do so in the future: One was grievously wounded, and the other was a suspect who had already attempted to flee the scene. The police had reason to believe that the perpetrators posed an immediate danger to others inasmuch as they were armed, in a crowded place, and had just engaged in an act of extreme violence. In light of these circumstances, it was not unreasonable for the police to settle on the show-up procedure that they adopted.

We find instructive the Supreme Court's decision in Illinois v. Lidster, 540 U.S. 419, 424 (2004), which held that the police did not run afoul of the Fourth Amendment by stopping motorists at a highway checkpoint to ask them about a fatal hit-and-run accident that had taken place a week earlier on that highway, notwithstanding the lack of individualized suspicion. 540 U.S. at 423-27. Lidster, like the case at hand, involved law enforcement's need to acquire information about a recent crime that had occurred in the vicinity. There is even more reason to find the show-up procedure in the instant case to be constitutionally permissible than the purely "information-seeking" traffic stop in Lidster, id., because the police had reason to believe that the club patrons included the perpetrators of the stabbings. Moreover, unlike Lidster, in which the traffic stop took place a week after the accident being investigated, the show-up in this case took place immediately after the stabbings

17

and involved exigent circumstances, as detailed above.  While the length of the detention in this case was greater than the duration of the stop in Lidster, the urgency for immediate police action was also substantially greater.  There was a strong showing in this case that, as in Lidster, the challenged seizure was "reasonable in context," id. at 426, and "hence constitutional," id. at 421.

The balance of interests further supports this conclusion. A search, or in this case, an identification procedure, may be reasonable where privacy concerns are minimal, the government interest is furthered by the intrusion, and the intrusion is properly tailored in time and scope to this interest.  See, e.g., id. at 424-25 (upholding a brief information-seeking highway stops without any individualized suspicion); McArthur, 531 U.S. at 330-34 (affirming the temporary restraint of an individual in a home believed to contain evidence of a crime and unlawful drugs); Pennsylvania v. Labron, 518 U.S. 938, 940-41 (1996) (per curiam) (upholding an automobile search); Skinner, 489 U.S. at 623 (affirming a warrantless drug-testing of railroad employees); Michigan v. Summers, 452 U.S. 692, 702-05 (1981) (upholding a temporary, warrantless detention of suspect without arrest to prevent flight); Martinez-Fuerte, 428 U.S. at 560-62 (affirming checkpoint border stops to guard against illegal immigration); Terry v. Ohio, 392 U.S. 1, 27 (1968) (upholding a temporary stop

18

and limited search for weapons).

Here, strong public interest and law enforcement concerns supported the need for the intrusion, because "the government's interest in dispensing with the warrant requirement is at its strongest when . . . 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.'" Skinner, 489 U.S. at 623 (quoting Camara v. Mun. Court, 387 U.S. 523, 533 (1967)); e.g., Gordils, 982 F.2d at 69.  As we have explained, the crime was serious and time was of the essence if identifications were to be made.

Moreover, privacy concerns were reduced in this case.  The show-up procedure on the street outside the club neither constituted a "search[] nor [affected] the sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection."  Martinez-Fuerte, 428 U.S. at 561.  And the club itself, which was open to the public, did not yield the same expectations of privacy as a private setting:  The show-up procedure, whereby the officers simply directed Palacios to line up inside the club and walk outside when so instructed, was far less invasive than, for example, a body frisk, which constitutes "a serious intrusion upon the sanctity of the person," "may inflict great indignity," and "is not to be undertaken lightly." Terry, 392 U.S. at 17; see also Ybarra, 444 U.S. at 95-96; Terry, 392 U.S. at 16-17, 17 n.13.  Thus, this case did not involve

19

heightened privacy interests that outweigh the law enforcement needs that prompted the show-up.

In addition, because the police took "reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy," McArthur, 531 U.S. at 332, there was appropriate tailoring. The detention was limited in scope: The police separated out the women and briefly held only the possible male suspects followed by the request that the men line up and walk out of the club one-by-one. The seizure was also limited in duration and was "no longer than necessary for the police, acting with diligence," to identify the perpetrators. Id. at 332; see also id. (finding reasonable a two-hour time restraint of an individual in his home).

Finally, the show-up is not realistically susceptible to an argument that it could have been less restrictive. "[R]easonableness under the Fourth Amendment does not require employing the least intrusive means . . . ." Earls, 536 U.S. at 837. Indeed, finding to the contrary could "raise insuperable barriers to the exercise of virtually all search-and-seizure powers," Martinez-Fuerte, 428 U.S. at 556 n.12, and "unduly hamper the police's ability to make swift, on-the-spot decisions," United States v. Sokolow, 490 U.S. 1, 11 (1989). In the situation at hand, the police could not have reduced further the number of potential suspects nor would it have been

practicable to bring the witnesses into the crowded club:  One was grievously wounded and the other was himself a suspect.  We are not inclined to "indulge in [such] unrealistic second-guessing" as to other methods that might have been employed.  Id. (internal quotation marks omitted).

Rather than supporting a "good Fourth Amendment claim," Kimmelman, 477 U.S. at 382, the "totality of the circumstances," Cortez, 449 U.S. at 417, and the "balance [of] privacy-related and law enforcement-related concerns," McArthur, 531 U.S. at 331, undermine Palacios's claim that the police show-up, following the Djukanovic and Kolenovic stabbings, violated Palacios's Fourth Amendment rights and tainted his subsequent arrest and confession.  Accordingly, we conclude that Palacios has not shown that counsel's decision not to pursue a Fourth Amendment challenge respecting the show-up rose to the level of "incompetence" as "unreasonable under prevailing professional norms" and "not sound strategy."  Kimmelman, 477 U.S. at 381; see also Strickland, 466 U.S. at 687-88.

**II.  Strickland's "Prejudice" Prong**

Because Palacios's claim fails to demonstrate constitutionally deficient "performance," the first prong of the Strickland test, this court need not reach the second "prejudice" prong.

**CONCLUSION**

21

For the reasons we have stated, Palacios has failed to meet his burden regarding his ineffective assistance of counsel claim. Palacios cites to, and we have found, no Supreme Court case that establishes that show-ups of the sort employed here, immediately following the commission of a violent crime in the vicinity, are unlawful seizures under the Fourth Amendment. It necessarily follows that the state court's denial of Palacios's ineffective assistance claim was not an unreasonable application of clearly established federal law as determined by the Supreme Court. Upon reviewing the state court's determination that Palacios did not receive ineffective assistance of counsel, see id. at 90 n.2, we conclude that Palacios is not entitled to a writ of habeas corpus, and that the district court properly denied his petition.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

22