**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**April 8, 2015**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

No. 13-1169

CHRISTIAN PAETSCH,

       Defendant – Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:12-CR-00258-WJM-1)**

---

John T. Carlson, Assistant Federal Public Defender (Warren R. Williamson, Federal Public Defender, Interim, and Virginia L. Grady, Federal Public Defender, Interim, with him on the briefs), Denver, Colorado, for Defendant – Appellant.

Robert M. Russell, Assistant United States Attorney (John F. Walsh, United States Attorney, and W. Aaron Vandiver, Special Assistant United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff – Appellee.

---

Before **BRISCOE**, Chief Judge, **TYMKOVICH**, and **PHILLIPS**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

At a street intersection in Aurora, Colorado, police officers barricaded 20 cars carrying 29 people after learning that one of the cars contained a tracker secreted in money stolen minutes earlier during a bank robbery. Delays in obtaining and properly

using a homing beacon slowed police in isolating which car had the stolen money. Twenty-nine minutes into the stop, police removed Christian Paetsch from his car after seeing him act suspiciously and disobey their orders by putting his hands back inside his car. About an hour after this, and after police had removed everyone from their cars, they looked through Paetsch's car window and saw a money band that banks use to wrap currency. Soon afterward, an officer with a homing beacon isolated the tracker's signal as coming from Paetsch's car. In total, police detained the other 28 people for 2 hours and 18 minutes.

After conditionally pleading guilty to a bank robbery and a firearm charge, Paetsch appealed the district court's denial of his motion to suppress evidence. He maintains that the barricade's group seizure was unreasonable at its inception and, if not, became unreasonable because of its duration and the police's tactics used during the barricade. We evaluate the stop at its two separate stages affecting Paetsch—first, the 29 minutes he was detained as part of the general barricade seizure, and, second, the 64 minutes or so after officers developed individualized suspicion of him due to his suspicious behavior. Finding that Paetsch's Fourth Amendment rights were not violated at either stage, we affirm the district court's order denying his suppression motion.[1]

## FACTS

_____

[1] We grant Paetsch's motion to take judicial notice of the materials outside the record. Appellant's Br. at 56.

On June 2, 2012, at about 3:47 p.m., a Saturday, Christian Paetsch walked into a Wells Fargo Bank in Aurora, Colorado, wearing gloves, a bee-keeper's mask, and dark clothes that concealed him from head to toe. In one hand Paetsch held an air horn, and in the other, a handgun. After blasting the air horn, he yelled for everyone to get down on the floor. He then snatched stacks of money from the teller's drawer, stuffed them into his coat pockets, and fled.

Unknown to Paetsch, one of the stacks of money contained a Global Positioning System (GPS) tracking device. Seconds after Paetsch had stolen the money from the teller drawer, the tracker began transmitting a silent signal to the Aurora Police Department, which allowed police to follow the tracker's street location on a computer monitor. Using these tools, police could locate the tracker to about a 60-foot diameter. Soon after the money left the bank, dispatchers began radioing the tracker's location to police officers in the field.

About five minutes after the robbery, dispatch reported that the tracker had stopped about a half-mile from the bank. Three minutes later, dispatch reported that the tracker was again moving, this time at speeds of 30 to 40 miles per hour, which likely meant that the currency, the tracker, and the bank robber were traveling in a car. Soon after this, dispatchers reported that the tracker was moving eastbound on Iliff Avenue toward Buckley Road and then that it had stopped at the intersection.

At 4:01 p.m., about 14 minutes after the bank robbery, Officer Kristopher McDowell arrived at the intersection and saw traffic stopped at a red light. Dispatch told him that the tracker was still stopped there. Before the light turned green, under pressure to make a

quick decision, Officer McDowell blocked the traffic with his patrol car and signaled with his arms and hands that the cars must remain stopped. Within minutes, several patrol cars arrived and barricaded the motorists from leaving in either direction. Using a public-address system, police ordered the motorists to raise their hands, outside their car windows if possible, and not to move. In all, the officers stopped a group of 20 cars containing 29 people.

At 4:08 p.m., seven minutes after Officer McDowell had stopped traffic, Lieutenant Christen Lertch arrived and took charge. He confronted a difficult situation. First, the police had little information about the bank robber's physical appearance. They knew only that one of the bank tellers thought the robber was male based on his voice, guessing that he was a Caucasian in his 20s or 30s. Second, the police had no information about what kind of car the bank robber was driving. Third, although the police knew that the bank robber was likely in one of those 20 cars, they could not say which particular car because the GPS could pinpoint the tracker's location only to a 60-foot diameter.

Lt. Lertch told dispatch to have officers working with "Safe Streets," an FBI task force, get a homing beacon to the scene as soon as possible. These beacons allow police to pinpoint a tracker's location to a 10-foot diameter. Dispatch notified Lt. Lertch that task-force officers were already coming with the beacon and would arrive within 20 to 30 minutes. Thirty minutes later, Lt. Lertch requested an update, and, after checking, dispatch told him it would be another 20 to 30 minutes. Frustrated, he then demanded to speak with the FBI Task-Force Officer, T.J. Acierno, a deputy sheriff working on the

FBI's "Safe Streets" program, impressing upon him with strong language the need for him to arrive as soon as possible.

Because it was a Saturday, Officer Acierno had begun the day off duty. When he learned of the bank robbery, he was at his home on the northwest side of Denver, about 25 miles from the barricade. To assist, Officer Acierno first needed to drive about 13 miles to an FBI office north of downtown Denver to get the beacon and then another 16 miles to get to Lt. Lertch on the southwest side of the city. He was delayed, first because he realized on the way that he had forgotten his keys to the FBI office and needed to return home to get them, and second because his siren broke along the way.

At about 4:30 p.m., before Acierno arrived with the beacon, police officers removed occupants from three of the cars toward the back of the group of 20. In two of those cars, officers had noticed the solo occupants behaving suspiciously. An officer saw a man in a car (a sports utility vehicle) shifting in his seat, repeatedly looking around, and failing to keep his hands outside his car as ordered. Officers removed the man from his car. He was the bank robber, Christian Paetsch.

To remove Paetsch from his car, a team of four officers approached it from the rear, with weapons drawn. They ordered Paetsch out of his car and on the ground. Paetsch complied. Officers approached him, handcuffed him, and sat him on a curb away from the cars. The officers used the same procedure to remove the other motorist who had acted suspiciously. They removed the occupants of a third car for tactical reasons.

At about 4:55 p.m., Officer Acierno finally arrived with the beacon. Despite his training, it soon became evident that he was unable to use the beacon correctly to locate

the GPS tracker. Even so, he did get a weak signal from one of the 20 cars, specifically from Paetsch's car. Because he could not use the beacon to its full capabilities, Officer Acierno called Patrick Williams, a Colorado state trooper also working as a "Safe Streets" task-force officer. Officer Williams was interviewing witnesses at the bank. Officer Acierno requested help with the handheld beacon, and Officer Williams began making his way to the barricade. No one told Lt. Lertch that Officer Williams was coming.

Meanwhile, at a standstill after Officer Acierno's disappointing performance with the beacon, Lt. Lertch ordered that his officers remove all occupants from the remaining 17 cars—again they did so using weapons and ballistic shields. Officers treated adults traveling without children as suspects and handcuffed them. At least in some cases, officers at close range fixed their firearms on the heads and bodies of the people removed from their cars. After ensuring that none were armed, officers sat them on the curb.

By 5:25 p.m., the officers had cleared out every car. Then they did a "secondary search," peering through car windows to ensure that nobody was hiding. R. vol. 3, at 197–98. During this secondary search, an officer saw through Paetsch's car window a $2,000 "money band"—a slip of colored paper that banks use to wrap stacks of money. *Id.* at 198–99. Upon being informed of this, Lt. Lertch and several other officers came over to see the money band.

Shortly after this, Officer Williams arrived. An expert in using handheld beacons, he set its functions correctly and quickly got a very strong signal from inside Paetsch's car. Officers then arrested Paetsch and put him in the back of a police car. A search of his car

revealed more incriminating evidence: $22,956 in cash, two handguns, boxes of ammunition, a mask, a wig, a pair of gloves, an empty air horn package, two fake license plates, and, of course, the GPS tracker embedded within a stack of money.

At 5:38 p.m., the police allowed the detained motorists to return to their cars but kept them there another 30 minutes to allow crime-scene investigators to gather information. In total, the police detained the innocent motorists from 4:01 to 6:19 p.m.

Three days later, a federal grand jury indicted Paetsch on two counts: (1) armed bank robbery, under 18 U.S.C. § 2113(a), (d); and (2) using and brandishing a firearm during and in relation to a crime of violence, under 18 U.S.C. § 924(c)(1)(A)(ii).

Paetsch filed a motion to suppress statements he had made to police as well as the physical evidence seized from his car. First, he argued that the initial stop had violated his Fourth Amendment rights because the police lacked individualized suspicion that any particular person stopped at the intersection had committed a crime. Second, he argued that the stop had violated his Fourth Amendment rights because the intrusion on the individuals' Fourth Amendment interests outweighed the government's interests.

The district court held a 3-day hearing and heard 16 witnesses testify. After this, it granted Paetsch's motion to suppress the statements he had made to police officers after invoking his right to speak to an attorney. *United States v. Paetsch*, 900 F. Supp. 2d 1202, 1221–22 (D. Colo. 2012). But the district court denied the motion to suppress the evidence seized from Paetsch's car. *Id.* Paetsch conditionally pleaded guilty to both counts, reserving his right to challenge the district court's suppression order.

The district court sentenced Paetsch to consecutive sentences of 2 months on the armed-bank-robbery count (despite an advisory guideline range of 41 to 51 months, and the mandatory minimum of 84 months on the § 924(c) count for brandishing a firearm during the bank robbery. Paetsch appealed.

## DISCUSSION

Under the Fourth Amendment, Paetsch challenges the denial of his motion to suppress physical evidence seized from his car. He argues that the barricade was unreasonable at its inception, unreasonable in its duration, and unreasonable in the means used to carry it out. Specifically, he contends under *Indianapolis v. Edmond* that the group seizure was not "appropriately tailored." And, under the balancing test set forth in *Brown v. Texas*, he argues that the barricade did not advance the public interest to a sufficient degree when weighed against its resulting interference with individual liberty.

We conclude that the stop was constitutional at its inception because it was in fact "appropriately tailored" to catch a fleeing, armed bank robber. We also conclude that the gravity of the public concern in apprehending the armed bank robber and the likelihood of advancing the public interest justified the intrusion on individual liberty—at least until police developed individualized reasonable suspicion of Paetsch. After that point, we have no reason to evaluate the reasonableness of the barricade seizure.[2]

---

[2] The Government has argued that any determination of whether the police violated any of the other barricaded people's Fourth Amendment rights should be determined not here but in suits brought under 42 U.S.C. § 1983. We simply note that our analysis of the barricade ends at the point officers developed individualized reasonable suspicion of

We apply a clear error standard when reviewing the district court's findings of fact. As noted by the district court, the operative facts are undisputed. *Paetsch*, 900 F. Supp. 2d at 1205. We review de novo the district court's conclusions of law—including its finding of reasonableness under the Fourth Amendment. *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012).

### 1. Did the Barricade Violate Paetsch's Fourth Amendment Rights?

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. Generally, a seizure made without individualized suspicion of wrongdoing is unreasonable. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (holding that a roadway checkpoint randomly stopping motorists without individualized reasonable suspicion for the primary purpose of general crime control—interdicting illegal drugs—violated the Fourth Amendment). A traffic stop is a "seizure within the meaning of the Fourth Amendment." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Because roadblocks and checkpoints seize people without individualized reasonable suspicion, they would violate the Fourth Amendment if subject to that general rule. And, even here, where police had GPS information showing that the tracker (and likely the bank robber) were in one of the 20 cars, police initially lacked reasonable, articulable suspicion of any *particular* person.

---

Paetsch, so nothing in this opinion speaks to the constitutionality of the barricade after that point.

- 9 -

But the "touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Samson v. California*, 547 U.S. 843, 855 n.4 (2006). Accordingly, the Supreme Court has carved out exceptions to the general rule where the primary purpose of a group seizure went beyond ordinary crime control. *See Edmond*, 531 U.S. at 37–38. For example, the Court has upheld a border patrol roadblock[3] designed to intercept illegal aliens. *United States v. Martinez-Fuerte*, 428 U.S. 543, 545 (1976). And it has upheld a sobriety checkpoint aimed at removing drunk drivers from the road to protect public safety. *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 447 (1990). In those situations, the Court has not required individualized reasonable suspicion, instead favoring a group-level balance of interests, weighing the public interest against intrusions on individuals' liberty.

In *Indianapolis v. Edmond*, the Court explained in dictum[4] that "there are circumstances that may justify a law enforcement checkpoint where the primary purpose would otherwise, but for some emergency, relate to ordinary crime control." 531 U.S. at 44. As one example, the Court noted, "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route."[5] *Id.* The

---

[3] As we use the terms in this opinion, roadblocks include checkpoints and barricades.

[4] We are bound by the Court's dictum on this issue. *See United States v. Orona*, 724 F.3d 1297, 1311 (10th Cir. 2013) (reiterating that "we are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements").

[5] Along the same lines, Justice Jackson addressed how reasonableness can accommodate emergencies in these words that help us and support *Edmond*:

Court distinguished the exigencies in those scenarios from "the circumstances under which authorities might simply stop cars as a matter of course to see if there just happens to be a felon leaving the jurisdiction." *Id.*

Here, the police knew far more than that an armed bank robber was fleeing on a "likely route": they knew that the stolen money (and likely the armed criminal who stole it) sat in a car idling at that very intersection. And, because the police barricaded only the 20 cars possibly containing the bank robber, their barricade was appropriately tailored to achieve its constitutional purpose—"to catch a dangerous criminal who is likely to flee by way of a particular route."[6] *See United States v. Abbott,* 265 F. App'x 307, 309 (5th

---

> If we assume, for example, that a child is kidnaped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger.

*Brinegar v. United States*, 338 U.S. 160, 183 (1949) (Jackson, J., dissenting).

[6] Different courts have considered whether a roadblock is "appropriately tailored" at separate points in the analysis. Analyzing a programmatic checkpoint in *Lidster*, the Supreme Court treated it as a consideration in weighing the second *Brown* factor. The Court said, "The stop advanced this grave public concern to a significant degree. The police appropriately tailored their checkpoint stops to fit important criminal investigatory needs." *Lidster*, 540 U.S. at 427. In *Abbott*, which analyzed an emergency roadblock like ours, the Fifth Circuit considered it a threshold question before turning to whether the roadblock was reasonable under the circumstances. It held that the roadblock at issue was not "unconstitutional *per se*" because it was "properly tailored to detect evidence of a particular criminal wrongdoing rather than for general crime control." *Abbott*, 265 F. App'x at 309. Finally, in *Palacios*, the Second Circuit discussed the issue in conjunction with the third *Brown* factor. It said that there was appropriate tailoring because the

Cir. 2008) (concluding an emergency roadblock was "properly tailored" because officers used an electronic tracking device to limit the search area). As such, the barricade's group seizure did not violate the Fourth Amendment simply because it lacked individualized suspicion of a particular motorist. But that does not entirely resolve whether the barricade comported with the Fourth Amendment. We still must examine whether it was reasonable under the totality of the circumstances.

To do so, we return to the Fourth Amendment's underlying principles and weigh the public interest justifying the seizure against the intrusion on individual liberty. Courts analyzing roadblocks have balanced those interests under three factors the Supreme Court announced in *Brown v. Texas*: "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." 443 U.S. 47, 51 (1979); *see, e.g.*, *Illinois v. Lidster*, 540 U.S. 419, 427–28 (2004) (analyzing a checkpoint under the *Brown* factors); *Martinez-Fuerte*, 428 U.S. at 556–64 (same); *United States v. Abbott,* 265 F. App'x 307, 309 (5th Cir. 2008) (per curiam) (analyzing under the *Brown* factors an emergency roadblock set up to catch a bank robber); *United States v. Rogers*, 244 F. App'x 541, 542–43 (5th Cir. 2007) (per curiam) (same).

### 1.1   The Gravity of the Public Concern

Officers at the roadway intersection knew that Paetsch was fleeing a bank robbery, and they knew he had brandished a firearm. These circumstances represent a

detention of patrons of a dance club was properly limited in scope and duration. *Palacios*, 589 F.3d at 565.

"substantial" public threat. *See United States v. Abbott,* 265 F. App'x 307, 309 (5th Cir. 2008) (per curiam) ("The public concern of apprehending armed bank robbers was substantial."); 4 Wayne R. LaFave, *Search and Seizure* § 9.7(a), at 955–56 nn. 26–37 (5th ed. 2012) (collecting cases upholding the use of roadblocks to address serious crimes). Paetsch himself admits that "there was a grave public concern animating the dragnet stop." Appellant's Br. at 42.

## 1.2  The Degree to Which the Seizure Advanced the Public Interest

When reviewing programmatic checkpoints, the Supreme Court has measured the second *Brown* factor based on what percentage of the total seizures uncovered wrongdoing. Officers here detained 20 cars, and one contained a bank robber. This 5% "hit" rate is higher than the hit rate of other roadblocks that the Supreme Court has found effective. *See, e.g.*, *Sitz*, 496 U.S. at 455 (finding a checkpoint that resulted in arrest for 1.6% of drivers passing through to be effective); *Martinez–Fuerte*, 428 U.S. at 554 (finding a checkpoint that uncovered illegal aliens in 0.12% of the vehicles passing through to be effective).

Of course, an emergency barricade like ours differs from a programmatic checkpoint.[7] In an emergency situation, the hit-rate analysis does not fully capture the substantial

---

[7] In the roadblock cases cited above, *Martinez-Fuerte* and *Sitz*, the Supreme Court examined programmatic checkpoints in which the police decided in advance to detain a random sample of dozens or hundreds of cars traveling along a particular route. They did so on the probability that they would find criminal activity. In our emergency barricade, by contrast, the police made a split-second decision to seize 20 cars in an emergency. And they did so based on specific evidence that they had ensnared an armed bank robber. Because our case is narrowly focused on a single armed bank robber and the emergency

weight of the second *Brown* factor in our case. Programmatic checkpoints address general public concerns, such as highway safety (*Sitz*) or border control (*Martinez-Fuerte*). Each "hit" incrementally advances the public interest—for example, by taking one drunk driver off the road. An emergency barricade, by contrast, addresses a specific concern—here, the threat posed by an armed, fleeing bank robber. In this context, a "hit" resolves the concern completely. This barricade's outcome proves its effectiveness: Paetsch in custody.

Not only was the barricade effective, but police knew it would be effective before setting it up. *Edmond* teaches that law enforcement must only employ an emergency roadblock absent individualized suspicion where a criminal is "likely to flee by way of a particular route." 531 U.S. at 44. Here police had reliable information that they had penned the bank robber at the traffic intersection. *See Palacios v. Burge*, 589 F.3d 556, 559, 564 (2d Cir. 2009) (holding a group seizure lacking individualized suspicion valid under the Fourth Amendment partly because the police "were armed with reliable information that the perpetrators were among the group of individuals"). Further, the officers knew that they had access to a handheld beacon that would pinpoint the tracker and thus, most likely, the bank robber.

---

he presented to public safety, we must weigh the *Brown* factors somewhat differently. For example, because of the emergency, we disagree with Paetsch that "all roadblocks" "must be brief and minimally intrusive, never 'generat[ing] concern or … fright on the part of lawful travelers.' " Appellant's Br. at 30 (internal quotation from *Martinez-Fuerte*, 428 U.S. at 557–58). Instead, the roadblock cases stand for the more general proposition that the balance of the *Brown* factors must prove favorable. This means that as the public interest increases so too does the latitude the Fourth Amendment provides. *See* supra, note 6.

Perhaps, as Paetsch suggests, the police could also have advanced the public interest by continuing to pursue Paetsch rather than barricading traffic at the stoplight. But "reasonableness under the Fourth Amendment does not require employing the least intrusive means…." *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 837 (2002). In fact, the means chosen to advance the public interest need only represent one "choice among … reasonable alternatives." *Sitz*, 496 U.S. at 453. Here, the district court found that the barricade advanced the public interest more effectively and less dangerously than the alternative proposed by Paetsch. *Paetsch*, 900 F. Supp. 2d at 1213–14. With dozens of officers after him, Paetsch would likely have noticed the police in hot pursuit. *Id.* at 1214. As the district court found, this could have led to a dangerous high-speed chase, or to Paetsch discarding or disabling the GPS tracker, a possibility mentioned by Officer Michael Thrapp at the suppression hearing. *Id.* Further, because of the moderate-to-heavy traffic conditions, officers might have been unable to locate the tracker to any particular car had they continued pursuing the signal. And, finally, police had to consider that the tracker's battery would last only four hours. In light of these factual circumstances and the Supreme Court's admonition not to "indulge in unrealistic second-guessing," *United States v. Sokolow*, 490 U.S. 1, 11 (1989) (internal quotation marks omitted), we conclude that the decision to barricade the 20 cars reasonably advanced the public interest.

## 1.3 The Severity of the Interference with Individual Liberty

The roadblock cases instruct us to weigh the first two *Brown* factors against the third—the severity of the interference with individual liberty. Here, police seized 29 people. When officers developed individualized suspicion of Paetsch, they had detained the innocent people in their cars for 29 minutes. While we sympathize with the innocent motorists caught in the barricade resulting from Paetsch's armed bank robbery, we conclude that these intrusions on individual liberty do not tip the scale in Paetsch's favor.

First, the law distinguishes between Fourth Amendment rights in cars and those in "the sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection." *Martinez–Fuerte*, 428 U.S. at 561. Second, by limiting detention to the 20 cars within the diameter of the GPS tracker, police took "reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *Illinois v. McArthur*, 531 U.S. 326, 332 (2001). Third, the duration of the seizure was "no longer than reasonably necessary for the police, acting with diligence," to identify the perpetrator. *Id.* When Lt. Lertch arrived, he learned from dispatch that the handheld beacon would arrive in 20 to 30 minutes. He reasonably relied on that estimate and detained the motorists accordingly. Within that time, police developed individualized reasonable suspicion of Paetsch.

Here, we find instructive the Second Circuit's decision in *Palacios v. Burge*. In that case, police detained patrons of a dance club without individualized suspicion while searching for suspects involved in a stabbing outside the club. *Palacios*, 589 F.3d at 559. Because the seizure did not occur in a private dwelling, the court afforded police more latitude under the Fourth Amendment. *Id.* at 564. The court also found appropriate

- 16 -

tailoring because, based on witness information, the officers limited the seizure to men inside the nightclub or standing in line outside. *Id.* Ultimately, the court found a 40-minute detention after police rounded up the 170 men to be reasonable. *Id.* Here, we find a 30-minute detention of 29 individuals to be reasonable.

Paetsch argues that we should incorporate into our analysis the privacy intrusions suffered by all the motorists during the entire barricade. We decline to do so because police developed individualized suspicion of Paetsch midway through it. Twenty-nine minutes into it, they saw Paetsch acting suspiciously and disobeying their orders by placing his hands inside his car. The district court emphasized that officers then had "sufficient suspicion of [Paetsch] in particular to remove him from his vehicle using invasive tactics." *Paetsch*, 900 F. Supp. 2d at 1216. Based on the GPS tracking information and Paetsch's suspicious movements, officers had reasonable suspicion that Paetsch might have been "armed and presently dangerous" and that "criminal activity may be afoot." *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). The reasonable suspicion grew stronger yet when Officer Acierno's beacon got a weak signal from just one of the 20 cars—that belonging to Paetsch. Notably, that occurred before police removed everyone from their cars.

The individualized suspicion toward Paetsch distinguishes our case from other roadblock cases, such as *Martinez-Fuerte* and *Sitz*. In those cases, the Supreme Court analyzed programmatic checkpoints against intrusions on innocent motorists detained. Those cases did not reach the situation presented here—how to analyze a Fourth Amendment claim when officers develop individualized suspicion toward a particular

person after the initial checkpoint encounter. The Court itself made this distinction. In *Sitz*, for example, the Court noted the decision's limited scope by acknowledging that there were "[n]o allegations … of unreasonable treatment of any person after an actual detention at a particular checkpoint." 496 U.S. at 450. The suit challenged "only the use of sobriety checkpoints generally." *Id.* Similarly, in *Martinez–Fuerte*, the Court acknowledged that it was not reviewing an "exercise of discretion in … operating a checkpoint," which operation would be "subject to post-stop judicial review." 428 U.S. at 559. *See also Lidster*, 540 U.S. at 428 ("The police stopped all automobiles systematically."). Paetsch cites no case like ours where police developed individualized reasonable suspicion of a defendant midway through a group seizure.

In our view, once individualized reasonable suspicion develops, a defendant may complain about the underlying checkpoint or barricade only for what happened up to that time. Once police develop individualized suspicion of a person seized as part of a group, that person may not rely on later intrusions on others detained by the barricade. To allow Paetsch to do so would violate the principle that "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978).

In *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), the Supreme Court recently applied *Rakas* to disallow expanding Fourth Amendment rights of a driver shot and killed in a high speed chase to include the Fourth Amendment rights of his passenger, who was also shot and killed by police. The Court considered whether the officers had used excessive force in violation of the Fourth Amendment. *Id.* at 2020. It applied the Fourth Amendment's "reasonableness" standard, which "requires a careful balancing of the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* Despite analyzing the totality of the circumstances, the Court rejected the argument that the presence of the passenger should be part of the driver's Fourth Amendment calculus:

> Our cases make it clear that Fourth Amendment rights are personal rights which … may not be vicariously asserted. Thus, the question before us is whether petitioners violated [the driver's] Fourth Amendment rights, not [the passenger's]. If a suit were brought on behalf of [the passenger] under either § 1983 or state tort law, the risk to [the passenger] would be of central concern. But [the passenger's] presence in the car cannot enhance [the driver's] Fourth Amendment rights. After all, it was [the driver] who put [the passenger] in danger by fleeing and refusing to end the chase, and it would be perverse if his disregard for [the passenger's] safety worked to his benefit.

*Id.* at 2022 (omission in original) (footnote omitted) (citations omitted) (internal quotation marks omitted). Likewise here, it would be perverse if Paetsch's disregard for the safety of the community worked to his benefit by enhancing his rights. In light of these considerations, we analyze only the liberty intrusions that occurred before individualized suspicion of Paetsch materialized.

In a related argument, Paetsch suggests that we should incorporate into our analysis the privacy intrusions that ultimately occurred—the two-hour detention and the invasive police tactics—because they were foreseeable from the outset. We disagree. Our analysis turns on the "facts known to the officers." *Alabama v. White*, 496 U.S. 325, 330 (1990). We must analyze the seizure "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396

(1989). And we recognize "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397.

Here, the officers could only act on the information they had—that the beacon would arrive soon. We see no evidence that Lt. Lertch knew or should have known from the outset where the task-force officers were in relation to the beacon or how Officer Acierno would prove inept in operating the beacon despite his training on its use.[8] Lt. Lertch surely could not have anticipated the delays caused by Officer Acierno's forgotten keys and broken police siren. Because the record does not establish that a reasonable officer would have anticipated these conditions and the resulting delay, we do not include them in our analysis.

In sum, officers set up the barricade to catch a fleeing, armed bank robber, and they knew they had access to a handheld beacon that could pinpoint him among the 29 people detained. Within the 30 minutes originally estimated for the beacon to arrive, police developed individualized reasonable suspicion of Paetsch. For the first 30 minutes of the barricade, until police obtained individualized reasonable suspicion of Paetsch, we

---

[8] Paetsch asserts that we should apply the horizontal-collective-knowledge doctrine to "pool" the knowledge held by all the officers involved and conclude that Lt. Lertch constructively knew that Officer Acierno did not know how to use the handheld beacon. Appellant's Br. at 50 & n.7. The doctrine applies when "individual officers have communicated the information they possess individually, thereby pooling their collective knowledge." *United States v. Whitley*, 680 F.3d 1227, 1234 n. 3 (10th Cir. 2012); *see also United States v. Shareef*, 100 F.3d 1491, 1503 (10th Cir. 1996) ("The cases in which we have applied the 'collective knowledge' rule all have involved actual communication …."). It is true that, upon arriving on the scene, Officer Acierno said, "I hope I remember how to work this." Appellant's Br. at 50. But that was at 4:55 p.m., after much of the delay had already occurred. Further, such a statement would not put a reasonable officer on notice that Officer Acierno would be unable to locate the GPS tracker.

conclude that the first two *Brown* factors—the gravity of the public concern and the degree to which the seizure advanced the public interest—outweighed the third—the severity of the interference with individual liberty. As such, we conclude that the barricade did not violate Paetsch's Fourth Amendment rights.

### 2. Has Paetsch Established Any Other Violation of His Fourth Amendment Rights?

We have determined that the barricade's group seizure was constitutional at least until 4:30 p.m. when officers developed individualized suspicion of Paetsch. After that, we analyze Paetsch's seizure on an individual basis. The district court found that the way in which the officers seized Paetsch "did not amount to an arrest of [him], but was simply a continuation of the investigative stop." *Paetsch*, 900 F. Supp. 2d at 1216. This is unchallenged on appeal. Thus, we analyze the seizure after individual suspicion materialized as an investigatory stop and ask whether its scope and duration exceeded constitutional bounds. *See United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).

First, we find that the means used to detain and control Paetsch were not unreasonably intrusive. While most *Terry* stops can be minimally intrusive, officers may take reasonable steps to ensure their personal safety. *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996). Those steps can sometimes include the display of guns, the use of handcuffs, and the use of other force. *Id.* (concluding that the display of guns, a pat down search, and the use of handcuffs were reasonable due to the danger defendants posed).

Here, officers had near-certain information that one of the 20 cars contained a fleeing, armed bank robber. Paetsch, sitting in one of the 20 cars, began acting suspiciously and

refused to comply with police commands. Reasonably concerned that he might "try to hurt [them] and try to get away," officers approached his car cautiously, with guns drawn. R. vol. 3, at 294. They then ordered him to the ground, handcuffed him, and sat him on a curb while they continued to try to definitively identify the bank robber. These represent reasonable steps in light of the threat posed by an armed bank robber.

Second, we find that Paetsch's detention was not unreasonably long. We do not impose a rigid time limit on investigative detentions. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). But the detention must "not exceed the reasonable duration required to complete the purpose of the stop." *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007). Once police had individualized reasonable suspicion of Paetsch and separated him from the barricaded group of innocent motorists, they could detain him for the time it actually took to get the beacon to locate the tracker. *See United States v. Villa–Chaparro*, 115 F.3d 797, 802–03 (10th Cir. 1997) (detention of over forty minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment).

Here, Paetsch's investigatory detention lasted about an hour and a half, from the beginning of the group seizure until his arrest. During that time, the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Sharpe*, 470 U.S. at 686. In particular, they waited for the handheld beacon. It is true that, faced with the delays, Lt. Lertch could have let all 20 cars loose, but he was reasonably concerned about the risk of a high-speed chase. He also decided not to release the cars one-by-one because he was reasonably concerned that the bank robber could then use his car as a weapon to injure an officer. The beacon's delayed arrival prolonged

Paetsch's detention, but under the circumstances, it was "no longer than reasonably necessary" to identify Paetsch as the bank robber and arrest him. *McArthur*, 531 U.S. at 332.

## CONCLUSION

The barricade in this case did not violate Paetsch's Fourth Amendment rights because, at least until individualized suspicion materialized, the public interest outweighed the intrusions on private liberty. After that, the officers' removal of Paetsch from his car was not unreasonably intrusive, and the officers' investigatory detention was not unreasonably long. Having found no Fourth Amendment violation, we affirm the district court's order denying Paetsch's motion to suppress.

No. 13-1169, United States v. Paetsch

**BRISCOE**, Chief Judge, concurring.

I concur in the result.

Although I agree with the majority that the roadblock implemented by the police in this case was constitutional at its inception, I disagree with the majority that the police developed individualized reasonable suspicion of Paetsch within approximately 29 minutes of the beginning of the roadblock. To be sure, it is undisputed that approximately 29 minutes after the initiation of the roadblock, Paetsch and another individual were removed from their vehicles, handcuffed, and directed to sit on a nearby curb, based upon what the police perceived to be suspicious behavior on their part. But the record indicates that this was a protective measure taken by the police to ensure officer and public safety, rather than an identification or seizure of the person the police believed to be the bank robber. Quite simply, I find no support for the conclusion reached by the majority that the police had an individualized reasonable suspicion of Paetsch at that point in their investigation. Notably, the police informed Paetsch, after he was removed from his vehicle and handcuffed, that he was not a suspect and they asked for, but were denied, his consent to search his vehicle. United States v. Paetsch, 900 F. Supp. 2d 1202, 1209 (D. Colo. 2012). Further, following the removal and handcuffing of Paetsch and the other individual, the police continued to wait for the homing beacon to arrive and be used. And, long after Paetsch and the other individual were removed from their vehicles and handcuffed, the police removed all persons who were single occupants of vehicles and handcuffed them. In doing so, high-risk traffic stop techniques were

utilized, with police officers in teams, and with weapons drawn, approaching the vehicles from behind. Ultimately, it appears that the police did not truly develop reasonable individualized suspicion of Paetsch until at least 5:28 p.m. (approximately 87 minutes after the initiation of the roadblock) when the police, in conducting their "secondary search" of every vehicle, observed through the front passenger side window of Paetsch's vehicle "a $2,000 bank 'money band,' a slip of colored paper from banks that wraps around a stack of bills." Id. at 1210.

But, even if I were to conclude that the length of the stop resulted in a violation of Paetsch's constitutional rights, I am not persuaded that this is an appropriate case in which to apply the exclusionary rule. As the Supreme Court has explained, the exclusionary rule is a "prudential" doctrine created to "compel respect for the constitutional guaranty" by "deter[ring] future Fourth Amendment violations." Davis v. United States, 131 S.Ct. 2419, 2426 (2011) (internal quotation marks and citation omitted). Consequently, the Supreme Court has "limited the rule's operation to situations in which this purpose is thought most efficaciously served." Id. (internal quotation marks omitted). "Where suppression fails to yield appreciable deterrence, exclusion is clearly . . . unwarranted." Id. at 2426-27 (internal quotation marks omitted). In other words, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Id. at 2427.

In this case, the record firmly establishes that the police acted in good faith,

2

both in initiating the roadblock and in attempting to identify the bank robber among the stopped motorists. The long delay in actually identifying Paetsch as the robber was not the result of "deliberate, reckless, or grossly negligent" conduct on the part of the police, id. (internal quotation marks omitted), nor was it the result of "any recurring or systemic negligence on the part of law enforcement," id. at 2428 (internal quotation marks omitted). Rather, the record indicates that the delay was the result of "simple, isolated negligence" on the part of the police in obtaining and initially using the homing beacon. Id. at 2427-28 (internal quotation marks omitted). In short, the police errors that occurred in this case "lack[] the culpability required to justify the harsh sanction of exclusion." Id. at 2428.

For these reasons, I affirm the district court's order denying Paetsch's motion to suppress.