STATE of Wisconsin, Plaintiff-Respondent,

v.

Damien Markeith Divone SCOTT,
Defendant-Appellant.†

Court of Appeals

*No. 2016AP1742–CR. Submitted on briefs June 6, 2017.
—Decided October 10, 2017.*

2017 WI App 74

(Also reported in 904 N.W.2d 125.)

† Petition for Review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Mark S. Rosen* of *Rosen and Holzman* of Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Brad D. Schimel*, Wisconsin Attorney General, and *Thomas J. Balistreri*, Assistant Attorney General.

Before Kessler, Brash and Dugan, JJ.

¶ 1. BRASH, J.   Damien Markeith Divone Scott appeals his conviction for armed robbery with the threat of force as a party to a crime. Scott entered a guilty plea to this charge after the trial court denied his motion to suppress the evidence that was found during a vehicle search. The vehicle, in which Scott was a passenger, was stopped by West Allis police at a road block that was set up shortly after the armed

robbery was committed. Scott argues that the police did not have reasonable suspicion to stop his vehicle, violating his Fourth Amendment protections against unreasonable searches and seizures, which renders the stop illegal. As a result, Scott asserts that the evidence obtained from the subsequent search of the vehicle should have been suppressed.

██

¶ 2.    The trial court ruled that the circumstances of the stop qualified as a valid *Terry*[1] investigative stop, as opposed to a "checkpoint" stop, which is not permitted in the absence of reasonable cause that a statutory or ordinance violation has been committed, pursuant to WIS. STAT. § 349.02(2)(a) (2015–16).[2] The trial court therefore denied Scott's motion to suppress.

¶ 3.    However, on appeal the State concedes that these circumstances did not constitute a *Terry* stop. Nevertheless, the State argues that these circumstances were sufficient to invoke an exception to the reasonable suspicion requirement of the Fourth Amendment for special needs of law enforcement. We agree and affirm.

### BACKGROUND

¶ 4.    In the early morning hours of September 29, 2015, an officer of the West Allis Police Department was "waved down" by a female outside of the 6500 Bar, located at 6500 West Greenfield Avenue in the City of West Allis. The female, L.B., stated that she had just been the victim of an armed robbery. L.B. explained that she was the co-owner of the 6500 Bar and had just

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

[2] All references to the Wisconsin Statutes are to the 2015–16 version unless otherwise noted.

closed it for the night. She had offered to give two people a ride home: A.W., a patron of the bar, and Cory Critton, who was later named as a co-defendant in this crime.

¶ 5. L.B. had in her possession at the time an animal print purse and a bank bag with the night's proceeds from the bar. She stated that as soon as she had gotten into her vehicle with A.W. and Critton, they were approached by a black male brandishing a handgun that was similar to a police service weapon. He was wearing a dark sweatshirt with a white design on the front, and had a bandana over his face. He ordered L.B. to give him both the bank bag as well as her purse. Additionally, Critton handed over two cell phones to the perpetrator. L.B. told Officer Jesse Fletcher that the perpetrator had then fled on foot, running east on Greenfield Avenue before turning into an alley between 64th and 65th Streets.

¶ 6. Officer Erin Luedtke of the West Allis Police Department responded to the armed robbery complaint as well. Officer Luedtke testified that standard police department protocol for this type of situation is for several officers to set up a perimeter around a crime scene to "contain the area" for purposes of searching for and identifying suspects. She explained that in her experience, perpetrators of crimes "tend to use vehicles to flee the scene." Thus, because the crime had taken place within the previous few minutes, she took up a position at the intersection of 65th Street and Madison Street, approximately one block away from the crime scene. She positioned her squad car across the southbound lane of 65th Street, effectively blocking the intersection of 65th Street and Madison Street, and activated the squad lights.

582

¶ 7.   While at that location, Officer Luedtke encountered three vehicles. The first vehicle contained two Hispanic males who were dressed in blue jumpsuits, consistent with uniforms worn by workers from a nearby factory. The occupants immediately confirmed that they had just finished work at the factory, so Officer Luedtke allowed them to proceed around her squad car.

¶ 8.   In the second car that Officer Luedtke confronted there were two black males, one of whom was driving and the other in the passenger seat. She noted that the passenger's sweatshirt was inside-out but had some sort of design on it, and that he was sweating and very nervous. By that time other officers had responded, and the passenger, later identified as Scott, was ordered to exit the vehicle. Scott appeared to search for a means of escape, and then began to physically resist the officers. He also attempted to grab Officer Luedtke's service pistol as well as an assault rifle that was strapped to another officer. The officers were eventually able to gain control of Scott, and he was taken into custody along with the driver, Damiso Lee.[3]

¶ 9.   After the arrests, the vehicle was searched; the police discovered two Glock pistols as well as a bank bag and an animal print purse. Furthermore, the police later retrieved messages from Critton's cell phone that was recovered from Scott, which indicated that Critton had set up the robbery with Scott. Critton, Lee, and Scott were all charged with armed robbery, with Scott incurring additional charges of disarming a police officer and resisting arrest.

---

[3] During the time that the officers were taking Scott into custody, the third vehicle was allowed to leave the scene.

¶ 10.   Scott filed a motion to suppress the evidence found in the vehicle, asserting that Officer Luedtke's stop of his vehicle was illegal because she did not have reasonable suspicion for the stop. At the motion hearing held on February 4, 2016, the trial court determined that the foundational issue was to ascertain the nature of the stops that Officer Luedtke had performed on both Scott's vehicle as well as on the other vehicle with the factory workers:   whether they were "checkpoint stops" or *Terry* stops.

¶ 11.   The court utilized a balancing test by applying the "totality of the circumstances" surrounding the stops in order to weigh "the government's interest in weeding out crime against the individual's right to personal security." The trial court opined that if the stops had been checkpoint stops they likely would not have passed constitutional muster. However, based on the totality of the circumstances, the court concluded that both stops were *Terry* stops. Furthermore, the court found that it was appropriate conduct by the police in that situation, and thus the stops were valid under *Terry*. Therefore, the trial court denied Scott's motion to suppress.

¶ 12.   Shortly thereafter, on February 8, 2016, Scott entered a guilty plea to the charge of armed robbery, the charge of disarming a police officer was dismissed outright, and the charge of resisting arrest was dismissed but read in. Scott was then sentenced on March 28, 2016. This appeal follows.

### DISCUSSION

■

¶ 13.   Scott's motion to suppress alleged that his Fourth Amendment right against unreasonable searches and seizures was violated. Our review of a

motion to suppress involves a two-step process: (1) we review the trial court's findings of fact and uphold them "unless they are clearly erroneous"; and (2) we then review *de novo* "whether those facts constitute reasonable suspicion." *State v. Sumner*, 2008 WI 94, ¶ 17, 312 Wis. 2d 292, 752 N.W.2d 783.

¶ 14. It is firmly established law in Wisconsin that "when police stop a vehicle, all of the occupants of that vehicle are seized," and thus the protections of the Fourth Amendment are triggered. *State v. Harris*, 206 Wis. 2d 243, 256–57, 557 N.W.2d 245 (1996); *see also Whren v. U.S.*, 517 U.S. 806, 809–10 (1996). The " 'touchstone of the Fourth Amendment is reasonableness,' " which is "measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (citation omitted). In applying the reasonableness test, the United States Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Id.* In determining the reasonableness of a search, the courts must weigh "the governmental interest which allegedly justifies" the search against "the invasion which the search . . . entails." *Terry*, 392 U.S. at 21. In making this determination, the courts look to " 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' " *Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (citation omitted).

¶ 15. Generally, a search or seizure will be deemed unreasonable "in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). However, the United

585

States Supreme Court has recognized that there are "limited circumstances in which the usual rule does not apply," such as when a "suspicionless search[]" is "designed to serve 'special needs, beyond the normal need for law enforcement.' " *Id.*

¶ 16. As previously noted, although the trial court determined that the stop of Scott's vehicle was an investigative stop under *Terry*, on appeal the State concedes that the stop of Scott's vehicle cannot be justified as such. Instead, it argues that the stop was nevertheless reasonable under the "special needs exception" whereby police checkpoints have been deemed constitutional even in the absence of individualized suspicion. Wisconsin appellate courts, however, have not adopted or even discussed this exception as it relates to checkpoints. Therefore, we begin our analysis of this argument by reviewing relevant federal case law.[4]

¶ 17. In explaining the special needs exception, the United States Supreme Court stated that there are "circumstances that may justify a law enforcement checkpoint where the primary purpose would otherwise, but for some emergency, relate to ordinary crime control." *Edmond*, 531 U.S. at 44. In fact, the Court noted examples such as "an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route" as situations in which the special needs exception could be properly invoked. *Id.* In other words, under circumstances where "special

---

[4] In fact, in this appeal Scott argues only that his federal Fourth Amendment right was violated; he does not present any arguments relating to the violation of any rights under the Wisconsin Constitution. Thus, we do not address his arguments from the basis of the Wisconsin Constitution.

586

law enforcement concerns . . . justify highway stops without individualized suspicion," the application of the special needs exception may be appropriate. *Lidster*, 540 U.S. at 424.

¶ 18. A review of the Supreme Court's decisions relating to the special needs exception provides further clarification. In *Edmond*, for example, the Court found that a narcotics checkpoint instituted by the City of Indianapolis violated the Fourth Amendment because its "primary purpose" was to "uncover evidence of ordinary criminal wrongdoing." *Id.*, 531 U.S. at 41–42. The Court distinguished this type of checkpoint from others it had previously upheld as constitutional, such as a sobriety checkpoint in *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990), and immigration checkpoints on highways close to the Mexican border in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), based on their primary purpose. *Edmond*, 531 U.S. at 37. The Court explained the distinction: "Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Id.* at 42.

¶ 19. In contrast, in *Lidster* at issue was the constitutionality of a police checkpoint where the purpose of the stop was to seek information relating to a hit-and-run accident that had occurred in the same area the week before. *Lidster*, 540 U.S. at 427. The Court declared that this checkpoint stop should be distinguished from the checkpoint in *Edmond* because in *Lidster* the purpose of the checkpoint went beyond ordinary crime control; therefore, the "presumptive rule of unconstitutionality" for checkpoints applied in *Edmond* was not applicable in *Lidster*. *Lidster*, 540

587

U.S. at 426. Instead, the Court determined that it was appropriate to apply the reasonableness factors to the individual circumstances of that case to resolve the issue. *Id.* at 426–27.

¶ 20.   In its analysis of the factors for determining reasonableness—the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty—the Court concluded that there was a grave public concern in finding a hit-and-run motorist who had caused a death which was advanced by this checkpoint. *Id.* at 427. Moreover, the Court found that "[m]ost importantly, the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect." *Id.* It noted that this checkpoint was analogous to police questioning pedestrians during the investigation of a crime. *Id.* at 425–26. In sum, the Court upheld this checkpoint as constitutional, stating that "the fact that such stops normally lack individualized suspicion cannot by itself determine the constitutional outcome." *Id.* at 424.

¶ 21.   Still, neither of these cases exactly tracks the factual scenario here:   a Fourth Amendment claim where individualized suspicion is developed toward a particular person after the initial checkpoint stop. However, a similar situation was addressed by the Court of Appeals for the Tenth Circuit in *United States v. Paetsch,* 782 F.3d 1162 (10th Cir. 2015), *cert. denied,* 136 S. Ct. 195 (2015). In *Paetsch,* the police in Aurora, Colorado, barricaded twenty cars on a street after learning that one of the cars contained a Global Positioning System (GPS) tracker that had been concealed with money stolen in a bank robbery minutes earlier. *Id.* at 1165. The tracker could locate the perpetrator to within a sixty-foot diameter. *Id.* at 1166.

¶ 22. Based on information from the tracker, the police knew that the perpetrator had gotten into a vehicle that was stopped at a red light. *Id.* While waiting for the arrival of an officer with a homing beacon that would narrow the location of the tracker to a ten-foot diameter, police removed the occupants of all of the vehicles that were detained at the checkpoint, including Paetsch, who was eventually identified as the bank robber. *Id.* at 1167. After Paetsch was removed from his vehicle, police spotted a $2000 money band in his vehicle, which is used by banks to wrap stacks of money. *Id.* After some difficulties with the homing beacon, police received a strong signal from the tracker coming from Paetsch's vehicle. *Id.* In the ensuing search of Paetsch's vehicle, police recovered two handguns and over $22,000 in which the GPS tracker was embedded, along with other items linking Paetsch to the bank robbery. *Id.*

¶ 23. Paetsch filed a motion to suppress, arguing that his Fourth Amendment rights were violated because the police did not have individualized suspicion at the time that they barricaded the street, and that intrusion on his Fourth Amendment rights outweighed the interests of the government. *Id.* at 1168. The district court denied the motion. *Id.*

¶ 24. The Tenth Circuit upheld that decision, concluding that the checkpoint stop utilized within the barricade was constitutional. *Id.* In making its determination, the court applied the special needs exception as it was applied by the Supreme Court in *Lidster*, because "the primary purpose of [the] group seizure went beyond ordinary crime control." *Paetsch*, 782 F.3d at 1169. The court then applied the reasonableness factors to the circumstances of the establishment of the barricade, and found that because the first two factors

(the gravity of the public concern and the degree to which the seizure advanced the public interest) outweighed the third (the severity of the interference with individual liberty), the barricade did not violate Paetsch's Fourth Amendment rights. *Id.* at 1175.

██

¶ 25. Turning to the facts here, the reasoning behind the checkpoint established by Officer Luedtke moments after the armed robbery is very similar to the purpose of the barricade established by the police in *Paetsch*: although Officer Luedtke did not have the benefit of a GPS tracker, she knew from her experience that the perpetrator had likely accessed a nearby vehicle after fleeing the immediate scene on foot. As such, the primary purpose of the checkpoint here went beyond ordinary crime control, in that it was an "appropriately tailored roadblock" set up by the police in order to apprehend "a dangerous criminal" who was "likely to flee by way of a particular route." *See Edmond*, 531 U.S. at 44. Therefore, rather than applying the "presumptive rule of unconstitutionality" to this checkpoint, we find that these circumstances warrant an analysis as to whether the application of the special needs exception to the protections of the Fourth Amendment, as it has been applied in federal case law, is appropriate here. *See Lidster*, 540 U.S. at 426.

¶ 26. Accordingly, we apply the reasonableness factors to the facts of this case. First, the gravity of the public concern is clear, in that an armed individual had just committed a robbery in the vicinity of where the roadblock was established. *See Paetsch*, 782 F.3d at 1170. The second factor, the degree to which the seizure advanced the public interest, is demonstrated by the effectiveness of the barricade: the perpetrator

of the armed robbery—Scott—was apprehended in the second vehicle stopped at the roadblock, and taken into custody. *See id.* at 1171.

¶ 27.  Federal case law indicates that the final step of the analysis is to weigh the first two factors against the third factor:  the severity of the interference with individual liberty. *See id.* at 1172. In this case, there were three vehicles affected by the roadblock. In the first vehicle, the occupants were determined to be factory workers on their way home, and they were waived through the roadblock in mere seconds. The second vehicle contained Scott, who was quickly identified as a suspect and taken into custody shortly after the vehicle was stopped. The third vehicle was allowed to leave the scene while the officers were taking Scott into custody.

¶ 28.  Based on our assessment of the circumstances as set forth in the record, we find that the severity of the interference with the individual liberties of those who were detained at the roadblock was minimal. Therefore, we find that in this case the Fourth Amendment protections represented by the third factor do not outweigh the public interest aspects of the first two factors.

¶ 29.  As a result, we find that, under these circumstances, the checkpoint established immediately after the armed robbery was constitutional. Therefore, although we disagree with the trial court's analysis of the stop and the proper standard for determining its reasonableness under the Fourth Amendment, we nevertheless affirm its denial of Scott's motion to suppress.

*By the Court.*—Judgment affirmed.