IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VERNON MONTGOMERY, | § | |
| | § | No. 242, 2019 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below–Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID 1710001043A (N) |
| Plaintiff Below, | § | 1710001043B |
| Appellee. | § | |

Submitted: January 10, 2020
Decided: April 3, 2020

Before **SEITZ**, Chief Justice; **TRAYNOR** and **MONTGOMERY-REEVES**, Justices.

## ORDER

Upon careful consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)   In February 2019, a Superior Court jury found Montgomery guilty of first degree robbery, possession of a firearm during the commission of a felony ("PFDCF"), and wearing a disguise during the commission of a felony ("WDDCF"). Immediately following the jury's verdict, Montgomery proceeded to a bench trial on related person-prohibited charges and was found guilty of possession of a firearm by a person prohibited ("PFBPP") and possession of ammunition by a person prohibited ("PABPP"). The Superior Court deferred sentencing, pending a

presentence investigation. On May 24, 2019, the Superior Court sentenced Montgomery to an aggregate of twenty years of Level V incarceration, followed by decreasing levels of supervision. This is Montgomery's direct appeal.

(2) At approximately 3:20 pm on October 2, 2017, a black male—later identified as Montgomery—walked into a WSFS Bank located on Union Street in Wilmington. Montgomery carried a black backpack and wore glasses, a ski mask, dark pants, a dark hoodie, and a neon construction vest. Montgomery approached WSFS employee Jonathan Dalacki and ordered him to hand over the contents of his cash drawer. Dalacki gave Montgomery the cash from his drawer, which included a money pack with a Global Positioning System (GPS) tracking device hidden inside. Montgomery grabbed additional cash, including a second money pack containing a GPS tracking device, from another bank employee's cash drawer. Montgomery then left the building and fled in the direction of West Third Street. A bank employee called 911 and reported the robbery.

(3) Almost immediately, the Wilmington Police Department began receiving location information from the GPS tracking devices. Through the Wilmington communications center ("WILCOM"), police dispatch was then able to relay that location information, along with information dispatch received from the 911 call, in real time to police officers on patrol. Via these transmissions, the following information was relayed: (i) the trackers were headed eastbound on West

2

Fourth Street; (ii) the trackers were travelling at a speed that suggested they were in a vehicle; (iii) the trackers were then stationary on the 1000 block of West Fourth Street; (iii) the suspect was a tall black man wearing glasses and a neon-colored construction jacket with hood; and (iv) the suspect had a gun.

(4)     The police quickly cordoned off the 1000 block of West Fourth Street, stopping traffic. Corporal Johnny Whitehead, Officer Kecia Rosada, and other responding Wilmington police officers began canvassing the area on foot. Corporal Whitehead approached a Chrysler 200 automobile from the rear and observed Montgomery, with his hands on the wheel, staring straight ahead. Montgomery's failure to acknowledge the police presence struck Corporal Whitehead as peculiar because the occupants of the other stopped vehicles appeared visibly surprised by the roadblock. Corporal Whitehead then reversed course and approached the car's driver's side window. Montgomery continued to stare straight ahead with his hands on the steering wheel, ignoring Corporal Whitehead's presence. Standing at Montgomery's window, Corporal Whitehead noted that Montgomery's appearance matched the general description of the suspect as a tall black male. Corporal Whitehead also observed latex gloves located in a cup in the vehicle's center console.

(5)     Contemporaneously, Officer Rosada approached Montgomery's vehicle from the front. From her vantage point, she could see a neon article of

3

clothing in Montgomery's lap. She gestured to Corporal Whitehead in its direction. After Corporal Whitehead saw the neon vest, he ordered Montgomery out of the car at gunpoint and placed him in restraints. Corporal Whitehead then opened a bag that was on the front passenger side floorboard and found a large quantity of cash and a handgun.

(6) The police impounded the vehicle and obtained a search warrant for it. The search yielded a black hooded sweatshirt, a traffic-safety vest, a ski mask, a cup containing blue plastic gloves, and two backpacks. Inside one of the backpacks, the police located a loaded 9-millimeter handgun, work gloves, two GPS units, and $7,385.00 in cash.

(7) Montgomery was a person prohibited from possessing a firearm or ammunition for a firearm because he had a prior felony conviction for armed robbery. On November 13, 2017, a Superior Court grand jury indicted Montgomery on first degree robbery, PFDCF, WDDCF, PFBPP, and PABPP. The Superior Court set a trial date for April 17, 2018.

(8) On February 7, 2018, and with the assistance of counsel, Montgomery filed an out-of-time motion to suppress the evidence seized from his car on the grounds that the search warrant was based in part on an improper warrantless search of Montgomery's backpack. On February 12, 2018, Montgomery requested to proceed *pro se*. At the request of defense counsel, on March 13, 2018, the Superior

4

Court ordered a psychological evaluation to determine Montgomery's competency to stand trial and waive the assistance of counsel. A completed evaluation was filed with the court in May 2018. After engaging in a colloquy with Montgomery to ensure that his waiver of the assistance of counsel was knowing and voluntary, the court granted his request to proceed *pro se* on June 21, 2018.

(9) Montgomery then filed an addendum to the motion to suppress, arguing that his initial detention was also illegal. Montgomery also filed a motion to suppress his post-*Miranda* statement, as well as several other motions, letters, and responsive pleadings. The Superior Court held a hearing on the outstanding motions on August 10, 2018. At the conclusion of the hearing, the Superior Court denied Montgomery's motion to suppress.[1] A new trial date was set for December 4, 2018.

(10) On October 15, 2018, Montgomery filed a motion to dismiss, claiming a violation of his right to a speedy trial. The court denied the motion because it found that (i) Montgomery had not previously raised concerns about his right to a speedy trial but, rather, had been focused on presenting and arguing the merits of the motion to suppress; and (ii) any delay was not attributable to the State but to the defense. After the State indicated a conflict with the December 4, 2018 trial date, the court moved up the trial date to November 27, 2018.

---

[1] The court also ruled on various other motions that are not at issue in this appeal.

(11)   On November 27, 2018, the parties appeared for trial.  At that time, the court learned that, due to an incident at the prison, correctional officers had confiscated Montgomery's legal papers and they had not yet been returned to him. Montgomery renewed his motion for dismissal of the indictment again asserting a violation of his right to a speedy trial.  The Superior Court continued the trial until February 5, 2019.

(12)   On November 28, 2018, prison personnel appeared before the Superior Court to explain why Montgomery's legal materials had been confiscated. Witnesses testified—and video evidence from the prison later confirmed—that a response team was called after Montgomery refused to obey a correctional officer's order.  The response team forcibly removed Montgomery from his cell and other prison officers removed Montgomery's personal belongings, including his legal paperwork.  In ruling on Montgomery's renewed motion to dismiss based on a violation of his right to a speedy trial, the Superior Court concluded that the latest delay was attributable to Montgomery.  The court also found that Montgomery's case had not been compromised because of the delay in his trial date and denied the motion.

(13)   On January 18, 2019, Montgomery filed a motion to sever the PFBPP and PABPP charges from the other counts of the indictment.  The Superior Court

6

granted the motion and ordered separate trials on the first degree robbery, PFDCF, and WDDCF counts ("the A case") and the PFBPP and PABBP ("the B case").

(14)  Montgomery's jury trial in the A case began on February 5, 2019. During the first day of trial, an allegation of juror misconduct arose. After the trial judge individually questioned each juror about the allegation, the court found that the jury had not been tainted and did not excuse any juror in connection with the allegation.[2]  The case proceeded to trial. Montgomery admitted that he had committed the bank robbery but argued that he did so under duress. The jury rejected Montgomery's defense of duress and found Montgomery guilty as charged. Montgomery proceeded to a bench trial in the B case and was found guilty of those charges as well. Montgomery then filed a motion for a new trial in the A case, arguing that the jury was impermissibly tainted due to juror misconduct. The Superior Court denied the motion. This appeal followed.

(15)  On appeal, Montgomery argues that: (i) his initial detention was illegal; (ii) the police did not have probable cause to conduct a warrantless search of his backpack; (iii) the Superior Court abused its discretion when it denied his motion to dismiss for violation of his Sixth Amendment right to a speedy trial; and (iv) the Superior Court erred in denying his motion for a new trial based on juror misconduct.

---

[2] One juror was excused for an unrelated reason.

(16) In assessing Montgomery's challenge to the denial of his motion to suppress as amended on the grounds that his detention and the warrantless search of his backpack violated the Fourth Amendment to the United States Constitution, we review such constitutional claims *de novo*.[3] We review the court's findings of historical fact under the deferential "clearly erroneous" standard.[4] However, we review its conclusion as to probable cause—that is, its application of the law of search and seizure to those historical facts—*de novo*.[5]

(17) Montgomery argues that he was illegally detained because: (i) the police did not have reasonable articulable suspicion to detain him; (ii) assuming they did, however, his detention was illegal because Corporal Whitehead did not ask the questions permitted by 11 *Del. C.* § 1902; and (iii) his detention exceeded two hours and therefore was prohibited by 11 *Del. C.* § 1902.

(18) The Fourth Amendment requires that searches and seizures be reasonable.[6] In the absence of individualized articulable suspicion of wrongdoing, a search or seizure is ordinarily unreasonable.[7] But the United States Supreme Court

---

[3] *Wheeler v. State*, 135 A.3d 282, 295 (Del. 2016). Montgomery argues that Article I, § 6 of the Delaware Constitution affords greater protections than the Fourth Amendment in this case. This Court has recognized that the Delaware Constitution: (i) provides greater protection for the individual when determining whether a seizure has occurred, (ii) does not allow for the good-faith exception to the exclusionary rule, and (iii) requires more than probable cause for the issuance of a nighttime search warrant. *Id.*, at 298 n. 71. None of these circumstances are present in this case.

[4] *Lopez v. State*, 861 A.2d 1245, 1248 (Del. 2004).

[5] *Donald v. State*, 903 A.2d 315, 318 (Del. 2006).

[6] *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000).

[7] *Id.*

has recognized that there are "limited circumstances in which the usual rule does not apply."[8]  For example, this usual rule does not apply when a search not based on individualized suspicion is "designed to serve special needs, beyond the normal need for law enforcement."[9]  In the absence of individualized articulable suspicion, courts measure the reasonableness of a seizure by balancing the individual's liberty interest against the public interests.[10]  The United States Supreme Court has identified three factors to consider when determining the reasonableness of such a seizure: (i) the gravity of the public concerns served by the seizure, (ii) the degree to which the seizure advances the public interest, and (iii) the severity of the interference with individual liberty.[11]

(19)  In connection with his argument that his detention was illegal, Montgomery contends that the police could not legally detain all of the vehicles traveling on the 1000 block of West Fourth Street.  But balancing the individual's liberty interest against the public interests, the courts have found that there are certain circumstances where a group seizure may be appropriately tailored to comport with the protections of the Fourth Amendment—for example, immigration

---

[8] *Id.*

[9] *Id.* (internal quotation marks and citation omitted).

[10] *Brown v. Texas*, 443 U.S. 47, 50 (1979).

[11] *Id.* at 50-51.

checkpoints[12] and DUI checkpoints.[13] And the United States Supreme Court has noted that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to … catch a dangerous criminal who is likely to flee by way of a particular route."[14]

(20) Here, the police had real time tracking information indicating that the money stolen from the WSFS bank by a man wielding a handgun was likely traveling in a vehicle that was stopped somewhere on the 1000 block of West Fourth Street. Under the circumstances, we are comfortable concluding that the cordoning off of the 1000 West Fourth Street to briefly detain[15] the vehicles traveling there was appropriately tailored to the circumstances: the gravity of the public concern over an armed robber on the lam, the degree to which the seizure advanced the public interest in apprehending the bank robber, and the relatively minor interference with the stopped individuals' liberty interests.[16] Moreover, after the vehicle stop, Corporal Whitehead developed individualized articulable suspicion that Montgomery was

---

[12] *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976).

[13] *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990).

[14] *Edmond*, 531 U.S. at 44.

[15] The audio of the WILCOM recording reflects that the total time between the bank robbery and Montgomery's detention was less than ten minutes. *Compare United States v. Paetsch*, 782 F.3d 1162, 1172 (10th Cir. 2015) (upholding the constitutionality of a roadblock established to capture a bank robbery suspect under almost identical circumstances where the police detained twenty-nine people for twenty-nine minutes until they developed individualized suspicion in the defendant).

[16] *See id.* at 1168.

10

committing or had committed a crime.[17]  In fact, that suspicion rapidly rose to the level of probable cause.  After all, Montgomery (i) was in a car in the area where the police knew that the GPS trackers were stopped, (ii) met the general description of the suspect, and (iii) had plastic gloves similar to those used to conceal fingerprints in his immediate vicinity.[18]  Corporal Whitehead also knew that the bank robber had worn some sort of neon-colored jacket, and he could see a brightly-colored item of clothing located next to Montgomery.  Montgomery's initial detention did not violate the Fourth Amendment.

(21)  Turning to Montgomery's claim that his detention ran afoul of 11 *Del. C.* § 1902 because Corporal Whitehead did not ask Montgomery for identification or inquire as to his business abroad or destination, we have previously observed that the statute is a permissive one.[19]  The police were simply not required to ask Montgomery his name, purpose, and business abroad.  And as discussed in greater detail *infra*, the police quickly developed probable cause to arrest Montgomery, which we find that they did at the scene.  Because they arrested Montgomery at the

---

[17] *See Woody v. State*, 765 A.2d 1257, 1262-63 (Del. 2001) ("There must be an objective justification for making the stop but reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.") (internal quotation marks and citation omitted).

[18] *See Idaho v. Gascon*, 812 P.2d 239, 241 (Idaho 1991) (upholding a detention where the police knew a bank had been robbed, had a general description of the suspect, and were situated at a place likely for the suspect to make an escape).

[19] *Buckingham v. State*, 482 A.2d 327, 333 (Del. 1984) ("It should be noted that the statutory language of § 1902(a) specifies that the officer 'may' demand of a person answers to the enumerated inquiries.  The mandatory term 'shall' is not used.").

11

scene and that arrest was supported by probable cause, his contention that the police violated 11 *Del. C.* § 1902(c) by detaining him for more than two hours is without merit.

(22) Montgomery next argues that the search of his backpack was an improper warrantless search. But we agree with the Superior Court's conclusion that Corporal Whitehead's reasonable articulable suspicion had blossomed into probable cause to arrest Montgomery when he viewed the fluorescent traffic vest in Montgomery's constructive possession.[20] Because Montgomery was arrested as he fled from the scene of the robbery, there was a reasonable probability that evidence of the crime—that is, either the money or the firearm—would be found in the vehicle. Thus, the police had probable cause to search Montgomery's vehicle and, under the automobile exception to the warrant requirement, they were permitted to do so without first obtaining a warrant.[21] Further, once the police had probable cause to search the vehicle, they had "probable cause to conduct a probing search of all compartments and containers within the vehicle" that may have concealed the

---

[20] Admittedly, the Superior Court muddied the waters somewhat by later finding that Corporal Whitehead had probable cause when he opened Montgomery's backpack and saw the handgun and money. But in our view, applying the law to the facts found by the Superior Court, we find that the Superior Court correctly found in the first instance that Corporal Whitehead had probable cause to arrest Montgomery when he saw the neon construction vest in Montgomery's possession.

[21] *Tatman v. State*, 494 A.2d 1249, 1251 (Del. 1985) ("So long as the police have probable cause to believe that an automobile is carrying contraband or evidence, they may lawfully search the vehicle without a warrant.").

objects of the search.[22]  Accordingly, the search of Montgomery's backpack was not an illegal warrantless search.

(23)  Montgomery next contends that the Superior Court abused its discretion when it denied his motion for dismissal based upon the violation of his right to a speedy trial.  To determine if a defendant's right to a speedy trial has been violated, we apply the four-factor balancing test adopted by the United States Supreme Court in *Barker v. Wingo*.[23]  The four factors are: (i) the length of the delay, (ii) the reason for the delay, (iii) the defendant's assertion of his right to a speedy trial, and (iv) prejudice to the defendant.  The factors are related, and no one factor is conclusive.[24]

(24)  A defendant's right to a speedy trial "attaches as soon as the defendant is accused of a crime through arrest or indictment, whichever occurs first."[25]  The first *Barker* factor, the length of the delay, is a threshold factor.[26]  We have previously determined that if the delay between arrest or indictment and trial exceeds

---

[22] *Ledda v. State*, 564 A.2d 1125, 1129 (Del. 1989).  *See also Wyoming v. Houghton*, 526 U.S. 295 (1999) (holding that police offers with probable cause to search a car for contraband may inspect passengers' belongings found in the car that are capable of concealing the object of the search); *California v. Acevedo*, 500 U.S. 565 (1991) (holding that the Fourth Amendment does not require the police to obtain a warrant to open a sack in a movable vehicle because they lack probable cause to search the entire car).

[23] 407 U.S. 514 (1972) (adopted by this Court in *Johnson v. State*, 305 A.2d 622, 623 (Del. 1973)).

[24] *Id.* at 530.

[25] *Middlebrook v. State*, 802 A.2d 268, 273 (Del. 2002).

[26] *Barker*, 407 U.S. at 530.

one year, we will consider the additional *Barker* factors.[27] In this case, the delay between Montgomery's arrest and trial date (October 2, 2017 to February 5, 2019) is greater than one year. Therefore, an examination of the additional *Barker* factors is appropriate.

(25) We turn to the reason for the delay. The United States Supreme Court has found that "different weights should be assigned to different reasons."[28] Deliberate attempts by the State to delay a trial should be weighed heavily in the defendant's favor.[29] It follows that a defendant who prolongs the proceedings cannot then blame the State for the resultant delay.[30]

(26) Here, the record reflects that the initial trial date of April 17, 2018, was continued after the court, at the request of defense counsel, ordered Montgomery to undergo a psychological evaluation to determine whether he was competent to stand trial or proceed *pro se*. Thereafter, the reasons for the delay were largely attributable to Montgomery's actions. After it was determined that Montgomery was competent, the court scheduled a motions hearing for August 10, 2018, to address the many motions Montgomery had filed. Montgomery filed several additional motions at that hearing. At the conclusion of the hearing, the court denied the motion to suppress

---

[27] *Dabney v. State*, 953 A.2d 159, 165 (Del. 2008).

[28] *Barker*, 407 U.S. at 531.

[29] *Id.*

[30] *Cooper v. State*, 2011 WL 6039613, at *7 (Del. Dec. 5, 2011) ("The Court also considers whether the defendant acted inconsistently with his assertion of the speedy trial right.").

14

and Montgomery subsequently indicated a desire to challenge that ruling by filing more motions, including: (i) a motion for reargument; (ii) a motion for the certification of an interlocutory appeal; and (iii) a motion for the opportunity to negotiate with the State regarding a stipulated plea arrangement. By contrast, the State made only one request that could be perceived as trying to delay the proceedings—a request to reschedule the December 4, 2018 trial date because of witness unavailability. In response, however, the court rescheduled the trial date to the *earlier* date of November 27, 2018. Finally, the reason that trial could not proceed on November 27, 2018, was attributable to Montgomery's failure to obey the commands of correctional officers. This factor weighs against Montgomery.

(27) The third *Barker* factor examines the defendant's assertion of the right to a speedy trial. Montgomery first raised the issue of his right to a speedy trial in a letter addressed to the Superior Court dated May 23, 2018. At that time, the court had not yet granted Montgomery's motion to proceed *pro se* nor had it held a hearing on Montgomery's motion to suppress.[31] Montgomery filed a formal motion to dismiss based on a violation of his right to a speedy trial on October 15, 2018. This factor weighs in Montgomery's favor.

---

[31] In his letter to the court asserting his right to a speedy trial, Montgomery refers to the many motions he wishes for the court to consider.

(28) The final factor, prejudice to the defendant, "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect."[32] The United States Supreme Court has identified three of these interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."[33]

(29) The first interest, to prevent oppressive pre-trial incarceration, weighs in favor of Montgomery because he was incarcerated during the delay. Montgomery does not allege he suffered from undue anxiety or concern due to his incarceration. With respect to the third interest, Montgomery claims that his defense was prejudiced because he had lost touch with witnesses who could corroborate his duress defense but he does not explain how those witnesses would have been located if the trial had not been delayed.[34]

(30) Giving due weight to the *Barker* test factors, we conclude that, under the circumstances present here, Montgomery's Sixth Amendment right to a speedy trial was not violated.

(31) Montgomery's final argument is that the Superior Court erred in denying his motion for a new trial due to juror misconduct. We review the denial of

---

[32] *Barker*, 407 U.S. at 532.

[33] *Id.*

[34] In fact, the record—cited by Montgomery—shows that Montgomery had already lost contact with these witnesses by the time of the suppression hearing held on August 10, 2018.

a motion for a new trial based on an allegation of juror misconduct for an abuse of discretion.[35] This Court also reviews the Superior Court's "decisions on the mode and depth of investigative hearings into allegations of juror misconduct and on the remedy for such misconduct for abuse of discretion."[36] In the juror misconduct context, a defendant is entitled to a new trial "only if the error complained of resulted in actual prejudice or so infringed upon defendant's fundamental right to a fair trial as to raise a presumption of prejudice."[37] When a judge determines that the jury may have been exposed to an extraneous influence that raises a serious question of possible prejudice, we have maintained that "the trial judge should conduct a *voir dire* of jurors to ascertain the extent of their exposure to the extraneous influence and to assess its prejudicial effect."[38]

(32) The record reflects that, on the first day of trial, Alternate Juror Number 2 sent a note to court indicating that she had overheard Juror Number 5 say that Montgomery struck men from the jury panel because he was guilty.[39] The Superior Court promptly notified the parties and ended the proceedings early that day to investigate the allegation further. Upon individual questioning by the trial judge,

---

[35] *Massey v. State*, 541 A.2d 1254, 1257 (Del. 1988).

[36] *Caldwell v. State*, 780 A.2d 1037, 1058 (Del. 2001) (internal quotation marks and citations omitted).

[37] *Hughes v. State*, 490 A.2d 1034, 1043 (Del. 1985).

[38] *Dixon v. State*, 2014 WL 4952360, at *3 (Del. Oct. 1, 2014).

[39] The Superior Court noted that Montgomery had not, in fact, excused all of the men on the panel.

the reporting juror indicated that a female juror sitting in the front row had made the comment. The reporting juror confirmed that, despite what she had overheard, she was keeping an open mind as to Montgomery's guilt or innocence.

(33) The trial judge proceeded to *voir dire* each juror individually. Juror Number 5 denied making any comment regarding Montgomery's guilt. No other juror reported hearing a comment made by any other juror about the jury selection process. One juror reported hearing someone say the word, "guilty," but he could not discern who said it or in what context it was said. Another juror reported, "Somebody jokingly said guilty, you know, but I think it was a joke."[40] Like the previous juror, this juror could not identify who said it and reiterated that he believed that the comment was made in jest.[41] After interviewing the jurors, the trial judge was satisfied that the facts did not warrant striking any juror from the panel. Moreover, the trial judge's *voir dire* of each juror reflected that each juror could continue to be impartial, keep an open mind as to the evidence, and render a fair verdict.

(34) Under the circumstances, the uncorroborated off-hand comment made by an unidentified juror that was disclosed to the trial court did not amount to actual prejudice to Montgomery. Further, Montgomery has not shown that there were

---

[40] Trial Transcript (2/5/19) at p. 229.
[41] *Id.* at p. 230 ("It was said in jest. Hope it doesn't go six weeks, that kind of thing.").

egregious circumstances of juror taint that would give rise to a presumption of prejudice. For these reasons, Montgomery's claim that the Superior Court abused its discretion in denying his motion for a new trial based upon juror misconduct must fail.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

19